Argued and submitted June 4; resubmitted en banc December 11, 2002, affirmed February 19, 2003

## STATE OF OREGON,
*Respondent,*

*v.*

## DANIEL PAUL MIGLAVS,
*Appellant.*

C000009CR, C000111CR; A111137 (Control), A111138
(Cases Consolidated)

63 P3d 1202

Garrett A. Richardson argued the cause and filed the brief for appellant.

Douglas F. Zier, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Deits, Chief Judge, and Edmonds, Landau, Haselton, Armstrong, Linder, Wollheim, Kistler, and Brewer, Judges.

LINDER, J.

Haselton, J., concurring.

Edmonds, J., dissenting.

Armstrong, J., dissenting.

## LINDER, J.

In this consolidated appeal, defendant challenges four convictions of unlawful possession of a firearm. ORS 166.250. He assigns error to the denial of his motion to suppress evidence obtained after police conducted a patdown search of him for officer safety reasons and discovered a handgun concealed in his waistband. Defendant also assigns error to the denial of his motion to suppress evidence seized several months later when, relying in part on information discovered in the earlier officer safety search, police obtained a warrant to search defendant and his apartment.[1] We affirm.

■     On appeal, a trial court's findings of historical fact are binding if they are supported by evidence in the record. *Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968). In this case, the trial court made extensive factual findings, none of which defendant challenges. In describing the pertinent events, therefore, we draw from the trial court's express findings, together with other facts contained in the record and all reasonable inferences favoring the trial court's ruling. *State v. Ehly*, 317 Or 66, 74-75, 854 P2d 421 (1993).

Just after midnight in August 1999, Officer Brown, who was on patrol alone, saw defendant and another man standing outside a car, talking to a woman seated in the car, in the parking lot of an apartment complex in Beaverton. They were below an apartment overhang, which caused the area to be fairly dark. Because Brown suspected that all three individuals were under 18 years of age and possibly violating curfew, she approached the group. On approaching, she saw alcohol in the car. She asked for identification so that she could determine if any alcohol-related or curfew violations may have occurred. Defendant and the woman in the car gave Brown their identification, which she kept while she ran a records check on them. The other male said that he was 17 years old and gave his name and date of birth in lieu of other identification. The dispatcher reported that defendant was a possible runaway, but defendant told the officer that he

---

[1] Defendant also challenges the sufficiency of the evidence to support his convictions. We reject that challenge without further discussion.

had recently turned 18. He also told the officer that he lived in the apartment complex, even though his identification listed a different address. He was unwilling to tell the officer in which apartment he resided.

Because she was on patrol alone, Brown called for backup while she was checking the ages and identities of the three individuals. Two backup officers arrived within a couple of minutes. By the time they arrived, Brown had determined that the driver of the car was 21 years old and therefore lawfully in possession of alcohol. She also had determined that defendant was 18 years old and therefore not violating curfew. Brown returned defendant's and the driver's identification to them, making no overture to cite or hold them. They were then free to go, but Brown did not expressly tell them that. They remained while Brown continued her investigation of the 17-year-old for a possible curfew violation.

At that point, Brown was concerned for her personal safety and that of the backup officers. Defendant and his male companion were wearing distinctive clothing commonly associated with a gang called the "18th Street" gang. Typical of that gang, defendant had a shaved head and was wearing baggy tan pants and a baggy black shirt with the term "18th Street" printed on the back in large white letters. Defendant's companion also was wearing baggy gang-style clothes and had a three-dot tattoo under his eye that is associated with gang membership. The baggy style of the clothing concerned Brown because, in addition to signaling gang affiliation, the clothing permitted easy concealment of a weapon. Within the preceding year, Brown had come into contact with a similarly attired gang member in the parking lot of the same apartment complex who, on a patdown search, was found to have a weapon concealed in his waistband under his baggy clothing. Also, based on her training and experience more generally, Brown knew that members of the 18th Street gang commonly carry weapons—in particular, guns.

One of the backup officers, Officer Cockreham, shared Brown's safety concerns. His concerns arose because of defendant's 18th Street gang-affiliated clothing, as well as the way in which defendant's shirt was draped over his waist.

Cockreham had personally removed weapons from several 18th Street gang members in the same general area (*i.e.*, along Allen Boulevard between Hall and King); one such encounter occurred "just previously to this incident" and the weapon he found on the gang member was a gun. Brown directed Cockreham to patdown defendant for weapons.[2] On doing so, Cockreham found a gun concealed in the waistband of defendant's pants.

Before trial, defendant moved to suppress the gun seized during the August safety search. Defendant also moved to suppress information obtained during a separate search of his person and residence in December pursuant to a warrant. Defendant's challenge to the December search was related to his challenge to the August safety patdown search. Specifically, the affidavit in support of the warrant relied in part on the fact that, as a result of that patdown search, defendant had been found in possession of a concealed firearm. Defendant argued that, without the information obtained in the August patdown, the warrant was not supported by probable cause.

The trial court concluded that Brown had reasonable suspicion to believe that defendant might be armed because of his appearance as an 18th Street gang member and the gang's reputation. The court observed that, because Brown needed to investigate and issue a citation to defendant's male companion for the curfew violation, "the officer was in a position of continuing her contact with all three of them, since the other two didn't choose to leave, including the defendant." The trial court specifically found:

> "I should add to the facts of this, other facts that are significant here are that the defendant's shirt had printed on it '18th Street.' Both officers had previous experience with members of that gang being armed and in that particular area of Beaverton, with people being armed, being stopped with weapons, on more than one occasion in recent times prior to this event.

> "I conclude from all this, frankly, it's almost like a neon sign. If you're going to wear a shirt that says '18th Street' in

---

[2] Brown did not personally frisk defendant because she thought he might be less comfortable with a woman officer conducting the frisk.

Beaverton, especially on Allen Boulevard, you're telling police officers and others that you're probably armed and dangerous. So from that standpoint, it would be foolish for the officers to conduct any type of an investigation in the presence of these people without at least a minimally intrusive frisk."

The court therefore denied the motion to suppress the evidence of the gun seized in the August search and also denied the related motion to suppress the evidence obtained pursuant to the December search warrant. On appeal, the parties renew the arguments they made below.

■■    A search conducted to ensure a police officer's safety fits within an exception to the warrant requirement "if, during the course of a lawful encounter with a citizen, the officer develops a reasonable suspicion, based on specific and articulable facts, that the citizen might pose an immediate threat of serious physical injury to the officer or to others then present." *State v. Bates*, 304 Or 519, 524, 747 P2d 991 (1987). To satisfy that standard, an officer's safety concerns must be based on facts specific to the particular person searched, not on intuition or a generalized fear that the person may pose a threat to the officer's safety. *State v. Reinhardt*, 140 Or App 557, 562-63, 916 P2d 313 (1996), *rev dismissed*, 327 Or 521 (1998).

■■    Here, defendant argues that the officers' concerns were not sufficiently particularized and were based instead on stereotypical assumptions about the practices of persons potentially associated with urban gangs. Defendant analogizes this case to those in which we have concluded that police may not rely merely on an individual's "outlaw biker style dress" or otherwise apparent affiliation with a motorcycle gang or club, reasoning that such reliance is too generalized to satisfy the particularity requirement of the standard. *See, e.g., State v. Dyer*, 157 Or App 326, 333 n 5, 970 P2d 249 (1998); *Reinhardt*, 140 Or App at 563. Rather, although a suspect's gang-related attire or affiliation can contribute to reasonable suspicion, it must be accompanied by particularized concerns personal to the suspect, such as the suspect's unusual or disconcerting behavior. *See, e.g., State v. Pope*, 150 Or App 457, 461-62, 946 P2d 1157 (1997), *rev den*, 327 Or

521 (1998); *State v. Redmond*, 114 Or App 197, 201, 834 P2d 516 (1992).

If defendant were correct that the officers in this case were concerned about their safety only because of stereotypical assumptions about gang members generally, defendant's reliance on *Dyer* and *Reinhardt* would be well placed. In *Reinhardt*, for example, officers executed a search warrant at a house in which stolen property was exchanged for methamphetamine. People visiting the house were described as "biker type people." The officers had information that, at some point within the previous two months, another individual of an unknown relationship to the house, to its owner, or to defendant was seen at the house carrying a gun. When officers entered to execute the warrant, the defendant was inside and was wearing a black "motorcycle-type" jacket and black boots. Officers frisked and restrained him for safety reasons while they conducted their search. *Reinhardt*, 140 Or App at 559. We declined to assume, based solely on the defendant's clothing and apparent biker affiliation, that he was dangerous. *Id.* at 562-63. Nor did any other information provide a particularized basis to assume that the defendant in *Reinhardt* was either armed or dangerous. The owner of the house was not known to be armed or to have guns in the house. *Id.* at 564. The fact that, at some time in the past, someone with no known relationship to the defendant had been observed on the premises with a gun did not provide any basis particularized to the defendant in *Reinhardt* to view him as a threat to the officers' safety. *Id.*

Both *Pope* and *Redmond* similarly involved individuals wearing biker-style apparel that suggested that they belonged to a gang. Their clothing and apparent affiliation was not, in and of itself, enough to justify officer safety patdowns of the suspects. But those facts in combination with only a few individualized facts and circumstances led us to conclude that the patdowns were lawful. In particular, in *Pope*, the defendant and a companion dismounted their bikes and separated in a way that made it impossible for the officer to observe both continually. The fact that the defendant was armed with a knife, even lawfully, legitimately heightened the officer's concern for his own safety. Those circumstances, combined with the officer's generalized concern about the

defendant's appearance, provided the necessary individualized basis for the officer's safety concern. *Pope*, 150 Or App at 459-62. Similarly, in *Redmond*, the officer's "generalized understanding of the practices of motorcycle club members became a specific and particularized reality when he saw that defendant was armed [albeit lawfully] with a knife." *Redmond*, 114 Or App at 201.

The starting point in this case is a different one than in those cases. The officers' safety concerns here were not stereotypical in the sense that they derived only from a generalized and oversimplified view of how all members of a broad group behave in all circumstances. Rather, Brown and Cockreham had *particular* training in and experience with members of a *particular* gang—the 18th Street gang—and its local activities. The officers, based on training and experience relating to that *particular* gang, knew that its local members commonly carried concealed weapons. They knew, moreover, that guns were often the weapon of choice for members of the 18th Street gang. The officers also had actual experience encountering members of the 18th Street gang in that area and discovering that they possessed concealed weapons, including guns.[3] One of the officers had found concealed weapons, including a gun, on local 18th Street gang members "just previously" to this incident.

Added to that knowledge are particularized facts regarding defendant and the circumstances of the encounter more generally. Defendant was dressed in gang-style baggy clothing; his shirt was draped over his waist in a way that concealed his waistband. His shirt boldly announced "18th Street" on the back. He was in the company of someone similarly attired who had a gang-related tattoo. Defendant and his gang-attired male companion were in a darkened area of the parking lot of an apartment complex that had housed one

---

[3] Brown may not have had a prior experience in which she personally disarmed a member of the 18th Street gang. She described an incident about a year earlier in which she disarmed a gang member at the same apartment complex where this stop occurred. But she could not recall if the disarmed individual was a member of the 18th Street gang. The trial court's finding that "[b]oth officers had previous experience with members of *that* gang being armed" therefore is not supported by Brown's own testimony. The finding is supported, however, in the sense that Cockreham's experience is imputed to Brown. *See State v. Simonsen*, 319 Or 510, 517, 878 P2d 409 (1994).

or more gang members in the past, and defendant claimed to live there but would not reveal precisely where. It was after midnight. Although the officer did not expressly tell defendant he was free to leave, the objective circumstances communicated that fact. Rather than go to his nearby apartment, defendant stayed in close proximity to the investigating officer who needed to remain to issue a citation to defendant's companion.

On whole, then, we have this: defendant was a likely member of not just an urban gang but of a particular gang known to operate in the area—the 18th Street gang—whose local members commonly carry guns; he was wearing clothes that could have concealed a gun; the officers had both longerterm and very recent experience with members of the 18th Street gang in the area who were armed with concealed weapons; it was late; it was dark; and defendant chose to protract the encounter with the officers. The totality of what the officers knew and the circumstances with which they were confronted went beyond a generalized understanding of the practices of urban gangs and encompassed a specific and particularized reality as to defendant and the 18th Street gang, of which defendant was a likely member.

To be sure, other facts detract from a conclusion that defendant could be unlawfully concealing a weapon or gun at the time of the patdown or otherwise posed a risk to the officers' safety. Defendant did not behave unusually or uncooperatively. *See Pope*, 150 Or App at 462. Brown had backup and was not alone. *See State v. Austin*, 145 Or App 217, 224, 929 P2d 1022 (1996), *rev den*, 325 Or 368 (1997) (fact that the officer lacked backup at the time of the search was relevant to officer's perception of safety risk). The officers were preparing to cite defendant's companion on a relatively minor offense. *See State v. Aman*, 164 Or App 348, 354, 991 P2d 1096 (1999) (arrest of defendant's passenger on felony drug charges and the real possibility that defendant himself was implicated "greatly increased the potential that defendant would resort to force to interfere in the passenger's arrest or to avoid his own arrest").[4] But those countervailing facts at

---

[4] We note that the converse of our observation in *Aman*—*i.e.,* that the fact that an officer is preparing to cite on a relatively minor offense *reduces* the safety risk to the officer—is not necessarily and always true. A citation on a minor offense can have significant consequences for particular individuals—for example, a defendant

most make this a closer case than it would be otherwise. They do not undermine the reasonableness of the officers' suspicion that defendant might pose a danger to their safety.

The dissenting opinions would reach a contrary conclusion and would hold that the officers' suspicion in these circumstances was unreasonable. In that regard, Judge Armstrong does not merely argue for a different conclusion on the facts before us. Rather, in arguing for that different conclusion, Judge Armstrong offers an analysis that is predicated on three distinct and significant flaws.

The first flaw is factual. Judge Armstrong analyzes the facts as though the officers in this case had, at most, generalized experience and training that the local members of the 18th Street gang often tended to carry weapons. The dissent views the circumstances here as being no different from an officer's nonspecific awareness of the activities of gangs generally—*i.e.*, any gang, anywhere. 186 Or App at 440 (Armstrong, J., dissenting) ("I do not see how training and experience that indicates that members of a *particular gang* often carry weapons is different from training and experience that indicates that members of a *particular type of gang* often carry weapons." (Emphasis added.)). The difference, however, is both legitimate and significant. Knowledge of what members of a particular gang do as they operate in a particular locale is more particularized than knowledge of what gangs generally do in unspecified locales. Said another way, it is one thing to know that gang members generally are often armed—which is a fact that at least has legitimate bearing on an assessment of an officer's reasonable safety concerns. But it is another and more meaningful thing to know that the local members of the 18th Street gang, who operate in a specific local territory, often are armed. The latter provides concrete and particularized experience that adds measurably to the reasonableness of the officer's suspicion.[5] That is so as a matter of ordinary common sense.

---

on probation can face revocation of that probation and incarceration (for an adult probationer) or commitment to a secure youth facility (for a juvenile probationer). But in this case, the officers did not articulate any such concern as a factor in their assessment of the safety risk that defendant posed.

[5] The same would be true in the case of an officer who knows from training that methamphetamine dealers generally are armed, as compared to an officer who knows from particularized training and experience that people involved in a specific local methamphetamine drug ring usually are armed.

That is all the more true in this case given the fact that more than one officer involved in the encounter had recent direct experience (*i.e.*, within the last year) with armed local members of the 18th Street gang; one of the officers (Cockreham) had removed a concealed gun from one such gang member "just previously to this incident." Judge Armstrong ignores that aspect of the record altogether, as well as the trial court's explicit finding that

> "[b]oth officers had previous experience with *members of that gang* being armed and *in that particular area* of Beaverton, with people being armed, being stopped with weapons, on more than one occasion in recent times prior to this event."

(Emphasis added.) Judge Armstrong's disregard of the record in that respect is perplexing at best.[6]

The second flaw in Judge Armstrong's analysis is also factual in nature—it is not faithful to our standard of review. We are to view all facts and *all reasonable inferences* in the light favoring the trial court's ruling. *Ehly*, 317 Or at 74-75. Although Judge Armstrong's initial description of the facts is unobjectionable under that standard, his later discussion drifts off course. Eventually, Judge Armstrong casts this as an encounter involving three people engaged in a simple social exchange who were "accosted" by the officer. 186 Or App at 441-42 (Armstrong, J., dissenting). Although there is no direct testimony by defendant or the others on the point, Judge Armstrong declares what they subjectively believed— *i.e.*, that, despite the return of their identification and the fact

---

[6] For many of the same reasons, Judge Edmonds is incorrect in asserting that, "under the majority's decision, any person dressed *in gang attire* and present *in a mall or other public place* is subject to a police patdown even in the absence of individualized suspicion. Rather, the patdown is based on *nothing more than circumstances under which a weapon could easily be concealed and the individual's apparent* association with a particular gang whose members are known by an officer to commonly carry weapons." 186 Or App at 436-37 (Edmonds, J., dissenting) (emphasis added). Our decision does not sweep so broadly. Again, it bears repeating that among the factors at work in this case are (1) this involved members of a *specific gang* known to operate in a *specific territory*; (2) the officers had *personal experience* with members of that gang in *their territorial area* who were armed, sometimes with guns; (3) one officer had removed a concealed gun from a member of this specific gang in *this same area just before this encounter*; (4) the gang clothing in which defendant was attired was being worn in a way that it could easily conceal a gun or other weapon; (5) it was late and it was dark.

that the officers' investigation ceased as to two of them, they understood that there had been no "change in the nature of the encounter"; that defendant and the driver had no awareness that they were free to go and that their 17-year-old companion was being "treated differently" and was to be cited; and that there simply was no reason for the 17-year-old's friends "to do anything except to wait for the officers to leave so that they could continue their social encounter." *Id.*

All of that represents an exercise of factfinding. None of those "facts" is established by direct testimony. Judge Armstrong infers the subjective understanding and beliefs of defendant and his associates from his characterization of the circumstances. Then, on the basis of those inferences, Judge Armstrong concludes that the officers could not reasonably have believed that defendant posed any danger to them. 186 Or App at 437 (Armstrong, J., dissenting). The inferences that Judge Armstrong might choose to draw are not the only inferences that reasonably may be made, and they are not those that are most favorable to the trial court's ruling. Quite simply, Judge Armstrong takes unwarranted license with the record.

The final flaw in Judge Armstrong's analysis is legal in nature: he inappropriately discounts the officers' training and experience as to the activities of local members of the 18th Street gang. As the Oregon Supreme Court has held, facts derived from general training and experience are a legitimate basis from which an officer may draw reasonable inferences about the nature of a circumstance that confronts the officer. *State v. Goodman,* 328 Or 318, 328, 975 P2d 458 (1999). *Goodman,* for example, involved an officer's general training that individuals involved in selling drugs frequently have records and other evidence of their drug activities in their residences. *Id.* at 322-23. The court concluded that the officer's expertise in that regard, when supported by objective facts connecting the defendant to an area near his home where marijuana was found growing, could provide the *particularized* nexus needed to search the defendant's home. *Id.* at 326-28. *Goodman* cited with approval other cases in which the same principle was at work, such as *State v. Herbert,* 302 Or 237, 242, 729 P2d 547 (1986). There, the court concluded that an officer's knowledge that paperfolds of a particular

shape typically are used as containers for drugs was legitimate information affecting the assessment of the officer's probable cause to seize a paperfold. *Id.* The logic behind that conclusion was syllogistic in nature: (1) paperfolds of a particular shape are often used for drugs; (2) the defendant possessed a paperfold of that particular shape; therefore (3) the officer legitimately had a basis to believe that the defendant's paperfold contained drugs. In effect, the Supreme Court has endorsed exactly the syllogistic logic that Judge Armstrong rejects—*i.e.,* (1) members of the 18th Street gang often are armed; (2) defendant appeared to be a member of the 18th Street gang; therefore (3) the officers legitimately had a basis to believe that defendant was armed. *See* 186 Or App at 440 (Armstrong, J., dissenting). Thus, the officers' prior experience and training regarding the activities of local members of the 18th Street gang, when connected to the objective facts (*e.g.,* apparent membership in the gang; clothing that could conceal a weapon; location of the encounter), are legitimate to consider in assessing the reasonableness of the officers' safety concerns. Judge Armstrong simply is wrong in concluding to the contrary. *See Goodman,* 328 Or at 328.[7]

■     The facts in this case may be close. That acknowledgment means only that we should especially heed the Oregon Supreme Court's admonition to avoid second-guessing an officer's judgment in the field:

> "[I]t is not our function to uncharitably second-guess an officer's judgment. A police officer in the field frequently must make life-or-death decisions in a matter of seconds. There may be little or no time in which to weigh the magnitude of a potential safety risk against the intrusiveness of protective measures. An officer must be allowed considerable latitude to take safety precautions in such situations.

---

[7] At one point, Judge Armstrong observes that defendant "was no more a threat to the officers at the midpoint of the encounter than he was at the beginning." 186 Or App at 441 (Armstrong, J., dissenting). *See also* 186 Or App at 436 (Edmonds, J., dissenting). No legal principle requires an officer to conduct a patdown at the earliest moment that he or she acquires a reasonable suspicion that a person may be armed, and Judge Armstrong cites none. If Judge Armstrong's point is that the officers' testimony as to their subjective concerns was not believable because of their delay in searching defendant, the answer to that point is that the trial court's factual findings are to the contrary, and Judge Armstrong is not at liberty to disregard them.

Our inquiry therefore is limited to whether the precautions taken were reasonable under the circumstances as they reasonably appeared at the time that the decision was made."

*Bates*, 304 Or at 524-25. The court's statement in *Bates* is a method of analysis, not an apologia. We should follow it, not merely recite it. Here, the precautions that the officers took were reasonable under the circumstances as they reasonably appeared at the time, and to the degree that the conclusion on that point is close, we should err on the side of giving the officers latitude in the situation. The trial court did not err in denying the motion to suppress the evidence found in the course of the officer's patdown search.

That conclusion also resolves defendant's second assignment of error, in which he challenges the evidence obtained as a result of a warranted search of his person and residence in December 1999. Defendant's only theory for challenging the search is that the affidavit supporting the warrant was inadequate to provide probable cause for the search without the information that defendant claims was illegally obtained in the August safety patdown search (*i.e.*, defendant's possession of a concealed gun). *See State v. Hitesman/Page*, 113 Or App 356, 359, 833 P2d 306, *rev den*, 314 Or 574 (1992) (illegally obtained information must be excluded from consideration in determining whether a warrant is supported by probable cause). Because we reject defendant's challenge to the August patdown search, we also reject his derivative challenge to the December search warrant.

Affirmed.

Deits, C. J., and Landau, Haselton, Wollheim, and Kistler, JJ., join in this majority opinion.

**HASELTON, J.,** concurring.

This is a hard case. Officer safety cases are frequently difficult—but this one is especially so.

Why? In general, officer safety cases are hard because they require judges to resolve a tension between our profound appreciation of line-level police officers and our

sworn obligation to enforce constitutional limitations on police conduct. Judges, like other citizens, respect—and frequently admire—police officers and the service that they perform every day. Most of us recognize that we could never do that work—and we are deeply grateful to those who do, and do it, so often, so well. We also recognize, even more than most in our community, that police work is dangerous—inherently, yet randomly, dangerous. Our empathy is necessarily imperfect—we can never *really* know what it is like to make a traffic stop at 2:00 a.m. on a deserted highway—but it is there, nevertheless.

That empathy is at least implicit in *Bates*'s axiom that we should not "uncharitably second-guess" the instincts of line officers in officer safety situations. *State v. Bates*, 304 Or 519, 525, 747 P2d 991 (1987). That empathy often silently underlies our decisions upholding officer safety searches. At some, perhaps subconscious, level, at least some of us ask, "If I had been the officer, what would I have done? Would I have been apprehensive—even scared? Would I have done the pat-down because the cost of being wrong is too high?" And if the answer is "yes," the usual result—precedent permitting—is to sustain the search.

But, for all that we invoke *Bates*, we rarely note that in *Bates* itself the court held that the search was *not* justified by officer safety concerns. 304 Or at 525-28. Empathy alone is not enough. There are constitutional limits. *Id.* at 527. *Accord State v. Rickard*, 150 Or App 517, 528, 947 P2d 215, *rev den*, 326 Or 234 (1997) (Haselton, J., dissenting). And, thus, the tensions.

This case exacerbates those tensions. That is so because a misunderstanding or misapplication of our holding can produce great mischief. Just as many of our officer safety decisions attempt to acknowledge and accommodate the real dangers of everyday police work, some of our decisions also involve pretextual abuses of police authority based on purported "officer safety" justifications. Those cases are infrequent, but they do occur—and it is the potential that over-zealous officers may view our decision today as *carte blanche* that is most disturbing.

So let's be clear: We do not authorize "officer safety" searches based solely on a citizen's "suspicious" appearance or possible association with a potentially dangerous group. In particular, our holding does not write a blank check for "officer safety" patdowns resulting from officer-initiated contacts with young men or women wearing "gang-style" clothing. Rather, our holding, in a very close case, is based on the confluence of the following factors: (1) defendant's explicit self-affiliation with an identifiable group; (2) at least one of the officers' very recent encounter in the same area with members of the same group who were unlawfully carrying concealed weapons; (3) defendant's baggy clothing, which potentially cloaked, but permitted ready access to, a concealed firearm; (4) the presence of defendant's two companions; and (5) the late hour in a darkened area.

Given the totality of those circumstances, and for the reasons expressed in the majority opinion, I concur.

Deits, C. J., and Wollheim and Kistler, JJ., join in this concurrence.

**EDMONDS, J.,** dissenting.

There is much in the majority opinion with which I agree. In my experience as a prosecutor, I had the opportunity to ride with police officers who conducted investigations involving potentially dangerous people in dark places in the middle of the night. I am fully cognizant of the dangers that they regularly face under such circumstances, and I agree that we, as a court, should avoid second-guessing an officer's life-or-death judgments in the field, if possible.

Having said that, I believe that it is also important to recognize that the constitution protects the right of association. All citizens, whether they belong to the local church or synagogue or to an urban gang, are protected from unreasonable searches and seizures by the government, and for good reason: we are a society governed by the rule of law. Without adherence to the constitution, we become a lawless society. There is no exception to the constitutional protections against unreasonable search and seizure applicable only to those who belong to gangs, wear baggy gang-related clothing, or identify with groups known to be violent. As we said in

*State v. Baldwin*, 76 Or App 723, 729, 712 P2d 120 (1985), *rev den*, 301 Or 193 (1986),

> "[p]eople are entitled to be evaluated on their individual behavior, not that of groups to which they belong. *See Reid v. Georgia*, 448 US 438, 100 S Ct 2752, 65 L Ed 2d 890 (1980) (that a person fits a 'drug courier profile' does not create reasonable suspicion justifying a stop in the absence of particular suspicious conduct by the person)[.]"

Rather, regardless of his dress or affiliation, defendant's conduct must be evaluated by the objective standard of particularized reasonable suspicion that the constitution imposes for determining if the officer's frisk was lawful.[1]

After the officer in this case finished her investigation of defendant and after he was free to leave, the only additional fact that could have caused the officer an objective concern that defendant might pose an immediate threat of serious physical injury to her or others was that he remained at the scene while she continued her investigation. Significantly, she did not tell him that he could leave, nor did she request that he "stand back" or depart the scene. Moreover, defendant did not refuse to leave or act in a threatening manner toward the officer at any time. It necessarily follows from those circumstances that the purported threat to safety that defendant posed was no greater at the end of the investigation that it was at the beginning. Except for his apparent gang affiliation, he was like any other citizen who was lawfully present at the scene and about whom there was no reasonable suspicion of any criminal activity after the officer ended her investigation of him. The officer who conducted the patdown did so only because of the officer's previous experience with gang members, the gang's reputation for carrying weapons, and defendant's apparent affiliation with that gang. Thus, under the majority's decision, any person dressed in gang attire and present in a mall or other public

---

[1] That objective standard is that an officer may take reasonable steps to protect himself or herself or others,

> "if, during the course of a lawful encounter with a citizen, the officer develops a reasonable suspicion, based upon specific and articulable facts, that the citizen might pose an immediate threat of serious physical injury to the officer or to others then present."

*State v. Bates*, 304 Or 519, 524, 747 P2d 991 (1987).

place is subject to a police patdown even in the absence of individualized suspicion. Rather, the patdown may be based on nothing more than circumstances under which a weapon could easily be concealed and the individual's apparent association with a particular gang whose members are known by an officer to commonly carry weapons. In my view, such a rule does not pass muster under either the state or federal constitution because it fails to acknowledge the requirement that there must be "a reasonable suspicion that *defendant specifically* was armed and presently dangerous." *Baldwin*, 76 Or App at 727 (emphasis in original).

I dissent for that reason.

Brewer, J., joins in this dissent.

**ARMSTRONG, J.,** dissenting.

An Oregon police officer can lawfully search for and seize weapons from a person when,

> "during the course of a lawful encounter with [the person], the officer develops a reasonable suspicion, based upon specific and articulable facts, that the [person] might pose an immediate threat of serious physical injury to the officer or to others then present."

*State v. Bates*, 304 Or 519, 524, 747 P2d 991 (1987). That means that the officer must reasonably suspect that the person is armed with a weapon that could be used to inflict serious physical injury and that the person might use the weapon against the officer or others who are present. Because the majority in this case upholds a search of defendant that met neither of those requirements, I respectfully dissent.

Defendant, an 18-year-old male, was in the parking lot of a Beaverton apartment complex with two other people just after midnight on August 19, 1999. One of the people, a 21-year-old female, was seated in a parked car. Defendant and the other person, a 17-year-old male, were standing near her on the driver's side of the car. A Beaverton police officer, Brown, drove her marked patrol car through the parking lot and saw the three people. She suspected that they were

under 18 years of age and were therefore committing a curfew violation by being outside at that time, so she parked and got out of her patrol car to investigate the suspected violation. As she did that, she called the Beaverton police dispatcher and asked to have another Beaverton police officer sent to assist her.

Brown approached the people by walking up to the passenger's side of the parked car. As she did that, she looked inside the car with a flashlight and saw a bag containing 40-ounce bottles of alcohol, which led her to suspect that one or more of the people was guilty of a liquor violation. She also saw that defendant was wearing clothing that suggested that he was a member of the 18th Street gang, a gang known to operate locally, and that the 17-year-old was wearing gang-style clothing and had a gang-related tattoo.

Brown asked the people for their identification. Defendant and the 21-year-old each gave her an Oregon driver license or identification card. The 17-year-old did not have any identification, but he gave Brown his name and date of birth. Using a portable radio and the identification information, Brown asked the Beaverton dispatcher if there were outstanding warrants for any of the people. The dispatcher reported that there were none but that defendant was listed as having run away from home. Brown asked defendant about that, and he explained that his parents had reported him as a runaway when he was younger but that the report now had no relevance because he was 18 years old. Defendant also told Brown that he lived in the apartment complex, but he would not tell her the apartment unit in which he lived.

Based on the information that she had received, Brown concluded that she had no basis to cite or arrest defendant or the 21-year-old for any violation. She did conclude, however, that she had a basis to cite the 17-year-old for a curfew violation. She returned the identification to defendant and the 21-year-old but did not tell them the conclusions that she had reached about possible charges.

Two backup police officers had arrived by that time, and Brown asked a male officer, Cockreham, to conduct a patdown search of defendant for weapons. Cockreham first

asked defendant if he would consent to a search. When defendant said that he would not, Cockreham proceeded to pat him down. In doing so, Cockreham found and took from defendant a handgun that was in the waistband of defendant's pants. The officers arrested defendant for unlawful possession of a weapon and took the 17-year-old into custody for a curfew violation.

The majority concludes that the police acted lawfully in searching defendant for weapons. In its view, the officers had sufficient information to lead them reasonably to suspect that defendant carried a concealed weapon, most probably a gun, and that he might use it against them.

On the first point, the majority relies on the fact that defendant was wearing clothing that suggested that he was affiliated with the 18th Street gang, that the clothing was baggy enough to conceal a weapon easily, and that the officers knew from their training and experience that members of that gang often carried guns for protection. Although I agree with the majority and the concurrence that the question is a close one, I am not persuaded that that evidence was sufficient to give the officers a reasonable basis to believe that defendant was a member of the 18th Street gang who, because of that membership, was reasonably likely to be carrying a gun.

We have twice before confronted cases in which police officers conducted patdowns for weapons of people who were or appeared to be members of motorcycle gangs. In the first, *State v. Redmond*, 114 Or App 197, 834 P2d 516 (1992), an officer stopped three members of the Brother Speed motorcycle club. The officer patted down one of the three for weapons, which led to the discovery of weapons and drugs. As support for the patdown, the state relied on training that the officer had received that indicated that members of motorcycle clubs such as Brother Speed often carry weapons. Although we upheld the patdown because, before the officer conducted it, he saw that the defendant was armed with a weapon, we rejected the idea that knowledge that motorcycle club members often are armed was sufficient to create a reasonable belief that the defendant, who was a member of such a club, was armed. *Id.* at 201.

The second case, *State v. Reinhardt*, 140 Or App 557, 916 P2d 313 (1996), *rev dismissed*, 327 Or 521 (1998), involved the execution of a search warrant at a house where police officers handcuffed the defendant in order to conduct the search. Among other reasons, they did so because the defendant had tattoos and was dressed in "biker" clothing. From their training and experience, they knew that members of "outlaw" motorcycle gangs often are armed, so they were concerned that he might have a weapon that he could use against them. We rejected that evidence as providing a reasonable basis to suspect that the defendant was armed because we concluded that the defendant's appearance could not reasonably lead to a belief that he was a member of an "outlaw" motorcycle gang. *Id.* at 563. We could as well have rejected the evidence for the same reason that we rejected the adequacy of the evidence about motorcycle clubs in *Redmond*. There, the officer's training indicated that motor-cycle club members often carry weapons. Other than a change in terminology, that is no different from the training and experience that indicated to the officers in *Reinhardt* that "outlaw" motorcycle gang members often carry weapons.

Here, the state relies on the officers' training and experience that indicates that members of a particular gang, the 18th Street gang, often carry weapons. I do not see how training and experience that indicates that members of a particular gang often carry weapons is different from train-ing and experience that indicates that members of a particu-lar type of gang often carry weapons. In either case, the state seeks to rely on the syllogism that people of a particular group often carry weapons, that the defendant appears to be a member of that group, and that it is therefore reasonable to suspect that the defendant is carrying a weapon. I believe that our cases reject that syllogism and require officers to identify something more than apparent membership in a group whose members often carry weapons in order to have a reasonable basis to suspect that a person is carrying a weapon.

Furthermore, even if the officers had a reasonable basis to suspect that defendant was carrying a weapon, they did not have a reasonable basis to suspect that he might use it against them. Although Brown asked for a backup officer

as she began her investigation of the three people for curfew violations and, later, a liquor violation, she did not wait for the backup officers to arrive before conducting the investigation. All of the people were cooperative throughout the encounter and did nothing to create any concern that they might act to harm the officers. Nevertheless, midway through the encounter, the officers patted defendant down for weapons. According to the trial court and the majority, defendant was free to walk away from the officers at that point in the encounter, so his decision to stay bears on whether the officers reasonably could suspect that he might pose a threat to them.

I respectfully disagree. In context, defendant's continued presence added nothing to any threat that he might pose. The three people whom Brown approached were all socializing around a parked car at midnight on a summer night in the parking lot of an apartment complex in which defendant lived. They apparently were not going anywhere when Brown approached them. Brown asked them for identification, which only two of them could supply. Brown's request for identification did not convert the encounter into a stop. *See, e.g., State v. Warner*, 136 Or App 475, 477-80, 901 P2d 940 (1995). Consequently, the three people were free to leave at any point in the encounter. Brown returned the identification to the two people from whom she had received it, but she did not say anything to them about her intention to pursue only a citation of the 17-year-old for a curfew violation. Because the 17-year-old did not have identification, there was no reason for defendant or the 21-year-old to interpret the return of *their* identification as signifying any change in the nature of the encounter. In other words, nothing about what Brown said or did indicated that the 17-year-old was being treated differently from the others.

In addition, the three people were not going anywhere when they were accosted by Brown, so there was no reason for them to be expected to do anything except to wait for the officers to leave so that they could continue their social encounter. Consequently, defendant's continued presence at the encounter did not change anything. He was no more a threat to the officers at the midpoint of the encounter than he was at the beginning. In fact, his cooperative attitude and

behavior undercut whatever generalized threat Brown or the other officers might have perceived him to represent at the outset of their encounter.[1]

Finally, it would not be reasonable for the officers to believe that defendant might act to harm them in order to prevent them from citing the 17-year-old and taking him into custody for a curfew violation, yet that is the concern that led them to pat defendant down. We should not uncharitably second-guess officers for actions that they take to protect themselves against harm, but nothing in the evidence in this case suggests that the officers could reasonably have suspected that defendant might use a weapon to harm them. Consequently, I respectfully dissent from the majority's conclusion that the officers conducted a lawful patdown of defendant.

---

[1] The majority contends that my discussion of the facts of the encounter is not faithful to our task on review because, in the majority's view, I draw inferences about the subjective beliefs of defendant and his companions that are not compelled by the evidence and that are inconsistent with the trial court's ruling. 186 Or App at 430-31. The majority misunderstands the point of the discussion. It is not addressed to the subjective beliefs of the participants in the encounter. Rather, it is addressed to the facts in the record that bear on what *the officers* could reasonably believe at that stage of the encounter. The issue for the trial court and us is whether *the officers'* belief about the danger that defendant posed was objectively reasonable. My discussion of the facts is addressed solely to that issue. In the same vein, the majority questions whether I intend to challenge the officers' subjective belief that defendant posed a threat to them at the time that they conducted the search. 186 Or App at 432 n 7. I do not.