FILED: May 20, 2004


IN THE SUPREME COURT OF THE STATE OF OREGON



STATE OF OREGON,


Respondent on Review,


v.


DANIEL PAUL MIGLAVS,


Petitioner on Review.


(CC C000009CR, C000111CR; CA A111137 (Control), A111138; 
SC S50279)


On review from the Court of Appeals.*


Argued and submitted March 3, 2004.


Garrett A. Richardson, Portland, argued the cause and filed
the brief for petitioner on review.


Jonathan H. Fussner, Assistant Attorney General, Salem,
argued the cause for respondent on review. Julie A. Smith,
Assistant Attorney General, filed the brief. With her on the
brief were Hardy Myers, Attorney General, and Mary H. Williams,
Solicitor General.


Before Carson, Chief Justice, and Gillette, Durham, Riggs,
De Muniz, and Balmer, Justices.**


DE MUNIZ, J.


The decision of the Court of Appeals and the judgment of the
circuit court are affirmed.



*Appeal from Washington County Circuit Court, Timothy P. Alexander, Judge. 186 Or App 420, 63 P3d 1202 (2003).


**Kistler, J., did not participate in the consideration or
decision of this case.




 DE MUNIZ, J.

The issue in this criminal case is whether a police
officer lawfully engaged in a precautionary patdown (1) of
defendant in accordance with the officer safety rule set out in
State v. Bates, 304 Or 519, 747 P2d 991 (1987). Because there
were multiple charges against defendant arising out of separate
police patdowns and a subsequent search of defendant's residence,
we first set out the procedural history in some detail.

Defendant was charged with two counts of unlawful
possession of a firearm based on evidence uncovered during a
patdown (the patdown at issue here) conducted in August 1999. 
Defendant moved to suppress the evidence that the police
discovered during that patdown. Following an evidentiary
hearing, the trial court denied defendant's motion to suppress
that evidence. 

The same indictment also charged defendant with two
other counts of unlawful possession of a firearm as a result of
evidence uncovered in a patdown that the police conducted in
September 1999. Defendant moved to suppress the evidence
obtained as a result of that patdown, and the trial court granted
that motion. 

Finally, the police executed a search warrant at
defendant's residence in December 1999 and seized evidence that
led to defendant being charged separately with seven other weapon
and drug-related crimes. Defendant moved to suppress that
evidence as well, and the trial court denied that motion. 

The court consolidated all charges and tried them at
the same time. Defendant ultimately was convicted of two counts
of unlawful possession of a firearm seized as a result of the
August patdown and three counts of unlawful possession of a
firearm seized during the December search of defendant's
residence. 

Defendant appealed, contending that the police had
relied on the evidence that they discovered during the August
patdown to obtain the search warrant that led to the discovery of
the evidence seized during the December search of defendant's
residence. A divided en banc Court of Appeals affirmed the trial
court's rulings denying defendant's motions to suppress evidence
discovered during the August patdown and the December search of
his residence. State v. Miglavs, 186 Or App 420, 63 P3d 1202
(2003). We allowed defendant's petition for review. For the
reasons that follow, we conclude that the August patdown was
lawful and, therefore, affirm the trial court judgment and the
decision of the Court of Appeals.

We take the following facts from the Court of Appeals
majority opinion:

"Just after midnight in August 1999, Officer
Brown, who was on patrol alone, saw defendant and
another man standing outside a car, talking to a woman
seated in the car, in the parking lot of an apartment
complex in Beaverton. They were below an apartment
overhang, which caused the area to be fairly dark. 
Because Brown suspected that all three individuals were
under 18 years of age and possibly violating curfew,
she approached the group. On approaching, she saw
alcohol in the car. She asked for identification so
that she could determine if any alcohol-related or
curfew violations may have occurred. Defendant and the
woman in the car gave Brown their identification, which
she kept while she ran a records check on them. The
other male said that he was 17 years old and gave his
name and date of birth in lieu of other identification. 
The dispatcher reported that defendant was a possible
runaway, but defendant told the officer that he had
recently turned 18. He also told the officer that he
lived in the apartment complex, even though his
identification listed a different address. He was
unwilling to tell the officer in which apartment he
resided.


"Because she was on patrol alone, Brown called for
backup while she was checking the ages and identities
of the three individuals. Two backup officers arrived
within a couple of minutes. By the time they arrived,
Brown had determined that the driver of the car was 21
years old and therefore lawfully in possession of
alcohol. She also had determined that defendant was 18
years old and therefore not violating curfew. Brown
returned defendant's and the driver's identification to
them, making no overture to cite or hold them. They
were then free to go, but Brown did not expressly tell
them that. They remained while Brown continued her
investigation of the 17-year-old for a possible curfew
violation.


"At that point, Brown was concerned for her
personal safety and that of the backup officers. 
Defendant and his male companion were wearing
distinctive clothing commonly associated with a gang
called the '18th Street' gang. Typical of that gang,
defendant had a shaved head and was wearing baggy tan
pants and a baggy black shirt with the term '18th
Street' printed on the back in large white letters. 
Defendant's companion also was wearing baggy gang-style
clothes and had a three-dot tattoo under his eye that
is associated with gang membership. The baggy style of
the clothing concerned Brown because, in addition to
signaling gang affiliation, the clothing permitted easy
concealment of a weapon. Within the preceding year,
Brown had come into contact with a similarly attired
gang member in the parking lot of the same apartment
complex who, on a patdown search, was found to have a
weapon concealed in his waistband under his baggy
clothing. Also, based on her training and experience
more generally, Brown knew that members of the 18th
Street gang commonly carry weapons--in particular,
guns.


"One of the backup officers, Officer Cockreham,
shared Brown's safety concerns. His concerns arose
because of defendant's 18th Street gang-affiliated
clothing, as well as the way in which defendant's shirt
was draped over his waist. Cockreham had personally
removed weapons from several 18th Street gang members
in the same general area (i.e., along Allen Boulevard
between Hall and King); one such encounter occurred
'just previously to this incident' and the weapon he
found on the gang member was a gun. Brown directed
Cockreham to patdown defendant for weapons. On doing
so, Cockreham found a gun concealed in the waistband of
defendant's pants."


186 Or App at 422-24 (footnote omitted). 

In affirming the trial court's rulings denying
defendant's motion to suppress the gun, the Court of Appeals
majority relied on this court's earlier decision in Bates. 
There, this court held that


"Article I, section 9, of the Oregon Constitution, does
not forbid an officer to take reasonable steps to
protect himself or others if, during the course of a
lawful encounter with a citizen, the officer develops a
reasonable suspicion, based upon specific and
articulable facts, that the citizen might pose an
immediate threat of serious physical injury to the
officer or to others then present."


Id. at 524. The Court of Appeals majority began its analysis by
characterizing the basis for the officers' particularized
suspicion of defendant:

"The officers' safety concerns here were not
stereotypical in the sense that they derived only from
a generalized and oversimplified view of how all
members of a broad group behave in all circumstances. 
Rather, Brown and Cockreham had particular training in
and experience with members of a particular gang--the
18th Street gang--and its local activities. The
officers, based on training and experience relating to
that particular gang, knew that its local members
commonly carried concealed weapons. They knew,
moreover, that guns were often the weapon of choice for
members of the 18th Street gang."


Miglavs, 186 Or App at 427 (emphasis in original). The court
concluded that several factors contributed to the officers'
reasonable fear for their safety:

"On whole, then, we have this: defendant was a
likely member of not just an urban gang but of a
particular gang known to operate in the area--the 18th
Street gang--whose local members commonly carry guns;
he was wearing clothes that could have concealed a gun;
the officers had both longer-term and very recent
experience with members of the 18th Street gang in the
area who were armed with concealed weapons; it was
late; it was dark; and defendant chose to protract the
encounter with the officers. The totality of what the
officers knew and the circumstances with which they
were confronted went beyond a generalized understanding
of the practices of urban gangs and encompassed a
specific and particularized reality as to defendant and
the 18th Street gang, of which defendant was a likely
member."


Id. at 428. The court thus affirmed defendant's convictions.

Judge Haselton agreed with the majority, but wrote
separately to clarify that the court's decision did "not
authorize 'officer safety' searches based solely on a citizen's
'suspicious' appearance or possible association with a
potentially dangerous group." Id. at 435 (Haselton, J.,
concurring). He further explained that "our holding does not
write a blank check for 'officer safety' patdowns resulting from
officer-initiated contacts with young men or women wearing 'gang
style' clothing." Id. (Haselton, J., concurring).

Judge Edmonds and Judge Armstrong dissented in separate
opinions. Judge Edmonds asserted that the constitutional right
to associate requires that the constitutional protections against
unreasonable searches and seizures apply equally to "those who
belong to gangs, wear baggy gang-related clothing, or identify 
with groups known to be violent" as they do to others. Id. 
(Edmonds, J., dissenting). He opined that defendant's decision
to remain at the scene after Brown concluded her investigation of
him was the only fact that could have contributed to her concern
that defendant might pose an immediate threat to her safety or
that of others. Id. at 436 (Edmonds, J., dissenting). But that
fact, Judge Edmonds asserted, was of little significance in light
of defendant's cooperative attitude and the fact that Brown did
not tell him that he was free to leave. Id. (Edmonds, J.,
dissenting). Judge Edmonds further posited that Brown's failure
to direct defendant to leave indicated that she did not perceive
defendant to be a greater threat at the end of the investigation
than she had at the beginning. Id. (Edmonds, J., dissenting).
According to Judge Edmonds, the majority's decision would permit
the police to patdown "any person dressed in gang attire and
present in a mall or other public place * * * even in the absence
of individualized suspicion[,]" contrary to Article I, section 9,
of the Oregon Constitution. (2) Id. at 436-37 (Edmonds, J.,
dissenting).

Judge Armstrong similarly believed that the officers'
knowledge that defendant was a member of the 18th Street gang,
and their prior experiences with that gang, were not "sufficient
to give the officers a reasonable basis to believe that defendant
was a member of the 18th Street gang who, because of that
membership, was reasonably likely to be carrying a gun." Id. at
439 (Armstrong, J., dissenting). He also could not discern a
difference between the officers' knowledge that defendant was a
member of a particular gang that was known to carry guns and
their knowledge that members of a particular type of gang carry
guns. Id. at 440 (Armstrong, J., dissenting). "In either case"
Judge Armstrong observed, "the state seeks to rely on a syllogism
that people of a particular group often carry weapons, that the
defendant appears to be a member of that group, and that it is
therefore reasonable to suspect that the defendant is carrying a
weapon." Id. (Armstrong, J., dissenting). He noted further, as
did Judge Edmonds, that Brown did not have a reason to fear for
her safety because defendant was cooperative and because Brown
had not waited for the backup officers to arrive to conduct her
investigation of the three individuals. Id. at 440-41
(Armstrong, J., dissenting). In Judge Armstrong's view,
defendant's failure to leave when Brown returned defendant's
identification was of no significance because Brown should have
understood that defendant merely wished to resume his encounter
with his friends. Id. at 441-42 (Armstrong, J., dissenting).

In this court, defendant relies on the dissenting
opinions by Judge Edmonds and Judge Armstrong and argues that the
Court of Appeals majority erred in its application of the Bates
rule because Brown did not have a particularized suspicion that
defendant was armed and might pose a threat to the officers'
safety. He observes that, when Brown had concluded her
investigation of defendant, she did not tell him that he was free
to leave, from which he argues that his failure to leave should
not have contributed to Brown's safety concerns. He notes
further that he was "cooperative and unthreatening" and, thus,
should not have made the officers feel that he presented an
immediate risk to their safety. 

The state responds that this court needs to decide only
whether "the officers' belief that defendant might be armed and
dangerous [was] a reasonable one." In its view, "the officers
reasonably believed that this defendant might pose an immediate
threat primarily because he had expressly affiliated himself with
a particular gang, the local members of which operate in the
immediate vicinity and, in the officers' training and experience,
often are armed." Further, the state argues, "[t]hat suspicion
was sufficiently particularized because it was based on
characteristics shared by a narrow and well-defined category of
persons with whom the officers had specific experiences and about
whom the officers had received training." For the reasons that
follow, we agree with the state.

We begin with a review of Bates. In that case, a City
of Eugene police officer stopped the defendant for "'excessive
vehicle emissions'" at 4:40 a.m. Id. at 521. The stop occurred
in a "'high crime'" area and the officer called for assistance. 
Id. Two officers approached the defendant's vehicle and one
officer asked for the defendant's driver license. Id. The
officers noticed that there was a "television and a videocassette
recorder [VCR]" on the back seat of the defendant's vehicle. Id. 
One officer also noticed "an object on the floorboard between
[the] defendant's feet." Id. The other officer also took note
of the object and "'asked [the defendant] if he would reach down
and very cautiously pull that item from between his feet," so
that the officer could see what it was. Id. The defendant
refused and instead "reached under the seat and remained in that
position" while the officer repeatedly asked him to pull the item
into plain view. Id. The officer then pulled his gun and
ordered the defendant to step out of the car. Id. The officer
then obtained the bag from under the seat, felt something hard
inside, opened it, and discovered "several rounds of live
ammunition, drugs, and drug paraphernalia." Id. at 522.

The court began its analysis by noting the state's
reliance on the Supreme Court's analysis of officer safety
searches in Michigan v. Long, 463 US 1032, 103 S Ct 3469, 77 L Ed
2d 1201 (1983), and this court's own previous analysis in State
v. Riley, 240 Or 521, 402 P2d 741 (1965), in which the court had
acknowledged that "police officers are entitled to take steps
reasonably necessary to their safety." Bates, 304 Or at 523. 
The court then held, as set out above, that Article I, section 9,
of the Oregon Constitution "does not forbid an officer to take
reasonable steps to protect himself or others if, during the
course of a lawful encounter with a citizen, the officer develops
a reasonable suspicion" that the suspect "might pose" a danger to
the officer or others. Id. at 524. The court explained that 

"it is not [this court's] function to uncharitably
second-guess an officer's judgment. A police officer
in the field frequently must make life-or-death
decisions in a matter of seconds. There may be little
or no time in which to weigh the magnitude of a
potential safety risk against the intrusiveness of
protective measures. An officer must be allowed
considerable latitude to take safety precautions in
such situations. Our inquiry therefore is limited to
whether the precautions taken were reasonable under the
circumstances as they reasonably appeared at the time
that the decision was made."


Id. at 524-25 (emphasis added). See also State v. Amaya, __ Or
___, ___ P3d ___ (April 29, 2004) (same).

The Bates court concluded, however, that the officers
had exceeded the permissible bounds of the rule. Id. at 525-26. 
It reached that result by assessing the significance of each
factor that the officer identified as contributing to his
conclusion that the defendant posed an immediate threat. Id. 
The officer testified that the vehicle's out-of-state license
plates, the time of day, the high crime area, the defendant's
appearance, the fact that there was a television and a VCR on the
back seat of the defendant's vehicle, and the fact that the
defendant did not comply with the officer's instruction to pull
into plain view the item that he could not see fully, all
contributed to his concern about the defendant's possible
dangerousness. Id. at 525.

This court, however, concluded that none of the
identified factors, even when considered collectively, supported
a reasonable suspicion that the defendant posed an immediate
threat to the officers' safety. The court observed that the
suspicions of the officer who ordered the defendant out of the
car 

"may have been an excellent guess–-the kind resulting
from a sixth sense that many officers develop over the
years. But, again, there is no objective quality to
them that entitles them to any weight, either
individually or collectively, in the constitutional
calculus. Neither the hour nor the 'high crime' nature
of the area tells us whether this defendant is likely
to be a criminal, unless there is some reason to think
that everyone driving in that particular area at that
time of night is up to no good[.]"


Id. at 526 (emphasis in original). As in Bates, our inquiry in
this case is limited to whether the precautionary patdown was
reasonable under the circumstances as they reasonably appeared at
that time. 

Here, the officers testified that the following factors
contributed to their determination that defendant might pose an
immediate threat to their safety: (1) defendant "was wearing
bagg[y] tan pants and a black bagg[y] shirt that had '18th'
written on the back of the shirt in large white letters[,]" (3)
which the officers associated with the attire of 18th Street gang
members; (2) the young man with defendant also had a gang-related
tattoo consisting of three dots in the shape of a triangle that
Officer Brown knew meant "'[m]i vida loca'" or "'my crazy life'
in English" and his shirt also had the number 18 on it; (3) both
defendant and the man with him were wearing, "untucked[,]"
"extremely bagg[y clothing that] could easily conceal weapons";
(4) the officers knew that 18th Street gang members operated in
the vicinity of the encounter and that they carried guns; (5)
Officer Cockreham personally removed weapons from several 18th
Street gang members and had, just previously to this incident,
had removed a gun from an 18th Street gang member; and (6)
neither defendant nor the woman in the car chose to leave after
Brown returned their identification. 

Before evaluating the factors described above, we first
address defendant's argument that his cooperative attitude and
lack of suspicious behavior was sufficient to dispel any concerns
that the officers had for their safety. Defendant is correct
that those circumstances must be considered in the overall
assessment of the reasonableness of the officers' decision to
engage in the patdown. However, defendant's attitude and
demeanor are just two circumstances that the officers and,
ultimately, this court must consider in determining whether the
totality of the circumstances justified the decision to engage in
a precautionary patdown. See State v. Ehly, 317 Or 66, 83, 854
P2d 421 (1993) ("totality of the circumstances" are considered in
determining whether officer's suspicion was reasonable). As we
now explain, those countervailing circumstances, considered in
light of the totality of the circumstances, are not sufficient to
dispel the reasonableness of the officers' particularized
suspicion that defendant might have posed a danger to their
safety. 

Under Bates, a limited precautionary patdown is
authorized under Article I, section 9, only when the initial
contact between the police and the individual is lawful. Here,
defendant concedes that Brown was engaged in a lawful contact
with defendant. Brown had approached the vehicle to investigate
possible curfew, and later, alcohol violations. She requested
defendant's identification and, upon concluding her
investigation, promptly returned defendant's identification to
him. In other words, as noted previously, the police contact was
not initiated solely (or at all) because defendant and his
companion were wearing gang attire.

Next, Bates requires an evaluation whether the factors
that the officers claim supported their belief that defendant
might pose an immediate threat to their safety are sufficiently
particularized to defendant as required under Article I, section
9. This court repeatedly has explained that a person's
appearance alone never can support a reasonable suspicion of
unlawful activity. See State v. Valdez, 277 Or 621, 628, 561 P2d
1006 (1977) (explaining that "shined shoes, sharp clothes, neat
'Afro' haircuts and people who stand and stare at officers"
cannot say much about those people engaging in criminal
activity); Bates, 304 Or at 525 (explaining that fact that
defendant was "an 'Indian' with long hair and beard" wearing
black leather jacket could not support reasonable suspicion to
believe that he was dangerous). A police officer's suspicion
must be particularized to the individual based on the
individual's own conduct. State v. Stanley, 325 Or 239, 245-46,
935 P2d 1202 (1997); Bates, 304 Or at 525; Valdez, 277 Or at 628. 
Regardless of the officers' belief that gang members wear baggy
clothing, that type of clothing alone could not support a
reasonable suspicion that defendant posed a risk to the officers'
safety. That is, nothing about such attire alone could tell the
officers anything about defendant, except that he liked to wear
baggy clothing. Nevertheless, a particular style of attire may
be a circumstance that, when considered in the overall context or
totality of the circumstances of a police-citizen contact,
contributes to the reasonableness of an officer's safety
assessment.

Similarly, clothing that announces a gang affiliation
does not, by itself, give rise to the kind of individualized
suspicion of a safety threat required under Article I, section 9. 
However, officers reasonably may draw inferences about human
behavior from their training and experience. See Stanley, 325 Or
at 246-46 (in officer's experience, people who commit robberies
often are armed); Ehly, 317 Or at 80-81 (in officer's experience,
drug users often are armed). In this instance, the officers knew
from training and recent personal experience that the gang
identified on defendant's shirt operated in the immediate
vicinity of the contact and that members of that gang carried
weapons. Furthermore, one of the officers recently had removed a
gun from one of the members of that gang. Under those
circumstances, the officers' safety concerns regarding defendant
were not based solely on generalized or stereotypical information
about gang behavior but, instead, were sufficiently
particularized, based on specific training about and recent
personal experience with a narrowly identified group, viz.,
members of the local gang to which defendant and his male
companion proclaimed their allegiance and which operated in the
area where the officers encountered defendant.

Finally, in addition to defendant's self-proclaimed
gang membership and the officers' training and recent experience
with other gang members, there are other factors that contribute
to the reasonableness of the officers' safety concerns. First,
the contact with defendant and his two companions occurred at a
late hour in a darkened area in the general vicinity where one of
the officers recently had encountered armed members of the 18th
Street gang. Defendant was uncooperative during the initial
investigation when he refused to reveal the location of his
residence in the apartment complex. See Amaya, ___ Or at ___
(refusal to leave purse-like bag in vehicle when requested to do
so was one factor that heightened officer's safety concern). 

Second, although defendant was free to move from the
immediate area after his identification was returned to him, he
chose to remain in the area near where the police were conducting
an ongoing investigation. When defendant remained in that close
proximity to the officers, the officers' safety concerns
reasonably were heightened because the officers needed to focus
their attention on defendant's companion and were not able to
watch defendant as closely as they could before that time. As
this court explained in Bates:

"A police officer in the field frequently must make
life-or-death decisions in a matter of seconds. There
may be little or no time in which to weigh the
magnitude of a potential safety risk against the
intrusiveness of protective measures. An officer must
be allowed considerable latitude to take safety
precautions in such situations." 


Bates, 304 Or at 524 (emphasis added).

Here, the combination of factors that the officers
identified were sufficient to give rise to a reasonable and
individualized suspicion that defendant might have posed a safety
threat to them. That individualized suspicion justified the
limited precautionary patdown of defendant that occurred in this
case and did not violate defendant's protection against
unreasonable search and seizure under Article I, section 9, of
the Oregon Constitution.

The decision of the Court of Appeals and the judgment
of the circuit court are affirmed. 





1. Our use of the term "patdown" is intended to mean "an
external patting of a person's outer clothing," as described in
ORS 131.605(3).

Return to previous location.



2. Judge Edmond's concern notwithstanding, this case is
not about whether Article I, section 9, would allow the police to
patdown a known gang member in a public place for the sole reason
of performing a patdown for weapons. Among other differences,
the patdown in this case occurred in the context of a lawful
police investigation and took place at night in the general area
where one of the officers had recently encountered an armed
member of the same gang.

Return to previous location.



3. Officer Cockreham testified that defendant's shirt
"actually said '18th Street' on it[.]"

Return to previous location.