Argued and submitted May 28, affirmed October 15, 1997

# STATE OF OREGON,
*Respondent,*

*v.*

# THOMAS ANDREW POPE,
*Appellant.*

## (94CR0915; CA A92870)

946 P2d 1157

Walter J. Ledesma, Deputy Public Defender, argued the cause for appellant. With him on the brief was Sally L. Avera, Public Defender.

Pilar C. French, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Virginia L. Linder, Solicitor General.

Before Riggs, Presiding Judge, and Landau and Leeson, Judges.

RIGGS, P. J.

## RIGGS, P. J.

Defendant appeals his conviction for unlawful possession of a firearm. ORS 166.250. He assigns error to the trial court's denial of his motion to suppress evidence obtained during a traffic stop of his motorcycle. We affirm.

On the evening of May 28, 1994, Deputy Sheriff Dykes and Reserve Deputy Bennett of the Josephine County Sheriff's Department were on traffic patrol in a remote area near the ghost town of Kerby. The officers saw two motorcyclists ahead of them, riding abreast. One of the motorcycles, ridden by defendant, had an unlit taillight, which is a traffic violation. Dykes turned on his vehicle's grill lights to signal the motorcyclists to stop. Defendant pulled immediately to the side of the road, but the second motorcyclist continued approximately 200 feet down the highway before stopping. Dykes had not indicated in any way which of the two riders he was signaling to stop. Before Dykes and Bennett left their vehicle, both riders climbed off their motorcycles and stood facing the patrol car.

A few days earlier, Dykes had attended a Sheriff's Department briefing at which officers were alerted that a gathering of "outlaw biker gangs" was planned for Memorial Day weekend in Kerby. Following the briefing, Dykes had attended a four-hour training class that the department held to inform officers about motorcycle gang insignias, initiations, protocols and related matters.

Based upon this training, Dykes made several observations about defendant and the second motorcyclist that, he testified, led him to believe that they were connected with the gathering of motorcycle gangs in Kerby. Both motorcyclists were riding modified "chopped" Harley Davidson motorcycles, which, according to the training Dykes had received, was the only style of motorcycle ridden by the gangs gathered in Kerby. The second motorcyclist was wearing a leather jacket adorned with green patches, which Dykes identified as the insignia, or "colors," of the Vagos, one of the gangs attending the Kerby gathering. Although defendant was not wearing Vagos colors, Dykes had been trained that full-fledged gang members are sometimes accompanied by prospective

members, or "probates." Probates are not entitled to wear gang colors until they have undergone gang initiation. Dykes had been instructed further that it was typical for a probate to carry one or more weapons for a full-fledged member as part of the initiation process, and that some gangs require probates to commit violent acts before their initiation is complete.

Dykes approached defendant and asked him whether he was carrying any weapons. Defendant answered that he had a knife in a sheath on his belt. Dykes removed the knife and secured it, and then asked defendant whether he was carrying any firearms. Defendant said that he was not. At that point, Dykes informed defendant that he was going to pat defendant down because of officer safety concerns. During the pat-down, Dykes felt a hard object, the size and shape of a small handgun, in defendant's left pocket. Dykes reached for the object, but defendant pulled away. Dykes then told defendant to stand still, unzipped defendant's leather coat, and discovered a fully loaded five-shot revolver in defendant's left inside pocket. Defendant was charged with unlawful possession of a firearm.

At trial, defendant moved to suppress the evidence of the handgun. The trial court denied the motion, and defendant was convicted after a trial to the court. On appeal, defendant assigns error to the trial court's denial of his motion to suppress, arguing first that Dykes impermissibly expanded the scope of the traffic stop of defendant's motorcycle, ORS 810.410(3)(b), and second that the search violated the Oregon and United States Constitutions. We are bound by the trial court's findings of fact so long as there is constitutionally sufficient evidence in the record to support them. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993). We review the trial court's legal conclusions for errors of law. *Id.*

Defendant first argues that Dykes could not inquire whether defendant was carrying a weapon, or pat defendant down, because in so doing Dykes was impermissibly expanding the scope of the original traffic stop. A police officer's actions during a traffic stop are limited under ORS

810.410(3)(b) to "investigation reasonably related to the traffic infraction, identification and issuance of citation." As the Supreme Court stated:

> "[A]n officer who stops a person for a traffic infraction may investigate only that infraction, unless the state can point to some basis other than the traffic infraction to broaden the scope of the investigation." *State v. Dominguez-Martinez*, 321 Or 206, 212, 895 P2d 306 (1995).

■ When Dykes asked defendant about weapons, he clearly expanded the scope of the original traffic stop. *See, e.g., State v. Peterson*, 143 Or App 505, 511, 923 P2d 1340 (1996) (questions about weapons at a traffic stop expanded scope of traffic stop). The state contends that this expansion was justified by legitimate concerns for officer safety. A police officer may

> "take reasonable steps to protect himself or others if, during the course of a lawful encounter with a citizen, the officer develops a reasonable suspicion, based on specific and articulable facts, that the citizen might pose an immediate threat of serious physical injury to the officer or others then present." *State v. Bates*, 304 Or 519, 524, 747 P2d 991 (1987).

The state asserts that Dykes' safety concerns were prompted by his reasonable belief that defendant was a probate gang member and by the riders' actions of separating as soon as the officer signaled them to stop and immediately dismounting from their motorcycles.

■ Dykes' belief that defendant was affiliated with the Vagos is not by itself enough to justify expansion of the traffic stop. An officer's "perceptions of the stereotypical practices of motorcycle club members is the kind of generalized suspicion that seldom will constitute a reasonable suspicion" that the defendant poses a danger, without additional factual support. *State v. Redmond*, 114 Or App 197, 201, 834 P2d 516 (1992). Thus, the question is whether the state has presented additional facts sufficient to justify Dykes' suspicion.

In *Redmond*, this court allowed a frisk of an apparent motorcycle gang member based upon officer safety concerns, after an automobile had attempted to block the officer

from getting behind a group of motorcycles in which defendant was traveling and the officer had seen that the defendant was wearing a knife in a sheath. *Id.* The court stated that the officer's "generalized understanding of the practices of motorcycle club members became a specific and particularized reality when he saw that defendant was armed with a knife." *Id.* The court also considered the fact that the defendant was wearing gang colors, and the attempted interference by the automobile driver, in determining that the officer's safety concerns were supported by sufficient facts. *Id.* Further, the removal of a single weapon, the sheathed knife, did "not diminish the reasonableness of [the officer's] belief that defendant might be armed with additional weapons and * * * presently dangerous." *Id.*

■■ Similar facts are in evidence here. As in *Redmond*, the fact that the officer believed, based upon his training and experience, that defendant was affiliated with a motorcycle gang, and therefore likely to be armed and dangerous, was not in and of itself enough to justify expansion of the traffic stop. However, when the two riders behaved in an unusual and disconcerting manner, by separating and immediately dismounting, Dykes' "generalized understanding of the practices of motorcycle club members became a specific and particularized reality." *Id.* Like the *Redmond* court, we consider defendant's actions in the context of the location of the stop and the actions of his companion in determining whether the circumstances as they reasonably appeared to Dykes gave rise to a legitimate concern for officer safety. *Id.* (considering the fact that an officer's "efforts to stop defendant had been obstructed by a car associated with defendant" as a specific and articulable fact supporting the officer's frisk of the defendant). The act of separating made it impossible for Dykes continually to observe both riders, and the act of dismounting before Dykes had left his vehicle made defendant appear more threatening. As this court has previously stated, "[w]e fully appreciate that, as a practical matter," officers feel "more vulnerable" when a party at a traffic stop leaves his vehicle, since the party then has "more freedom of movement." *State v. Senn*, 145 Or App 538, 545, 930 P2d 874 (1996). Nor did the discovery of a single weapon, the sheathed knife on defendant's belt, make the subsequent patdown unreasonable. As the *Redmond* court noted, an officer's

discovery of a single weapon in a party's possession may reasonably increase, rather than lessen, the officer's suspicion that the party is holding additional weapons. *Redmond,* 114 Or App at 201. We agree with the state that in this case Dykes has testified to sufficient specific and articulable facts to justify his concern for officer safety, and to allow his expansion of the scope of the traffic stop.

■      Next, defendant argues that Dykes' questioning and frisk of defendant violated constitutional prohibitions on illegal searches and seizures embodied in Article I, section 9, of the Oregon Constitution and the Fourth Amendment to the United States Constitution. Defendant's Fourth Amendment argument is not preserved. We will not consider issues raised for the first time on appeal. ORAP 5.45(2); *State v. Hitz,* 307 Or 183, 188, 766 P2d 373 (1988). Defendant's sole reference to the Fourth Amendment at trial was in his skeletal motion to suppress, wherein he baldly stated that Dykes' actions violated that amendment. Defendant made no reference to the Fourth Amendment, and cited no Fourth Amendment cases, in either his memorandum of law accompanying his motion to suppress or his argument on that motion to the trial court. Merely writing the words "Fourth Amendment" in a skeletal motion to suppress, without more, does not preserve the issue for appellate review. *State v. King,* 307 Or 332, 336, 768 P2d 391 (1989); *State v. Riggs,* 143 Or App 427, 431, 923 P2d 683 (1996), *rev den* 325 Or 247 (1997).

■ ■      Defendant's Article I, section 9, argument is preserved, but unavailing. An officer safety search passes Article I, section 9, scrutiny if the state shows, through "specific and articulable facts," sufficient basis for an officer's belief that a citizen poses an imminent threat of serious physical harm to the officer or others. *Bates,* 304 Or at 524. That is the same standard under which we judge whether an officer's expansion of a traffic stop is justified on officer safety grounds. *Senn,* 145 Or App at 542. When, as in this case, the state has justified the expansion of a traffic stop with specific and articulable facts sufficient to support a legitimate concern for officer safety, it has also met its constitutional burden of justifying a warrantless officer safety search under Article I, section 9, since the standard is the same.

Affirmed.