Argued and submitted October 31, 2001, reversed and remanded October 16, 2002

## STATE OF OREGON,
*Respondent,*

*v.*

## CHARLES ROBERT WIGGINS,
*Appellant.*

## 99CR0716FE; A108121

56 P3d 436

Meredith Allen, Deputy Public Defender, argued the cause for appellant. With her on the brief was David E. Groom, Acting Executive Director, Office of Public Defense Services.

Ryan Kahn, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Haselton, Presiding Judge, and Linder and Wollheim, Judges.

LINDER, J.

## LINDER, J.

Defendant appeals his conviction of possession of a controlled substance (PCS), assigning error to the trial court's denial of his motion to suppress. Defendant argues that reasonable suspicion did not support the investigating officer's decision to pat him down and that the officer lacked reasonable suspicion to believe that a lump in defendant's pocket contained a weapon. Although we reject defendant's challenge to the patdown, we agree that the officer did not have reasonable suspicion to believe that the lump in defendant's pocket contained a weapon. We therefore reverse and remand.

The material facts are undisputed. A confidential reliable informant (CRI) told Officer Berry that Mike Wiggins, defendant's brother, had a substantial amount of methamphetamine in his van, along with packaging materials and scales. The CRI described the van as being a motor home-type vehicle, its color, and the last three digits of the license plate. At approximately 6:30 p.m., the officer saw a van matching the CRI's description. The officer stopped the van because the license plate light was not working; Mike Wiggins was driving. After talking to Wiggins about the light, the officer let him go.

At approximately 9:00 p.m., the officer saw the van a second time and stopped it for driving over the fog line. Wiggins immediately got out of the van and met the officer between their vehicles. The officer asked Wiggins who owned the van. Wiggins responded that it was his, that he had just purchased it, and that he was using it as his primary residence. The officer then explained to Wiggins that he stopped him because Wiggins had driven over the fog line and that the officer had been informed that there was methamphetamine in the van. The officer then asked Wiggins for consent to search the van, and Wiggins refused. The officer told Wiggins he was going to search the van anyway due to the information he had received from the CRI.

Approximately five to 10 minutes after the initial stop, the officer asked Wiggins to remain near the officer's vehicle with Sergeant Green, a backup officer from the

Reedsport Police Department who had just arrived on the scene. The officer then walked up to the passenger side of the van and contacted the two passengers who were still seated inside. The officer asked the two passengers, defendant and Fowler, to step out of the van. At that point, the officer knew that Wiggins had owned upwards of 100 or more firearms and knew, in his training and experience, that people who use and sell methamphetamine tend to carry firearms to protect themselves and their drugs. The officer also knew that defendant was an experienced hunter.

For his safety, the officer patted both men down for weapons. The officer did not find any weapons or contraband on Fowler. When the officer attempted to pat defendant down, defendant protested and produced a "rights card" that his attorney had given him on a prior occasion. The officer patted defendant down anyway. When he did so, the officer felt a "lump" in the right rear pocket of defendant's jeans. He did not know what the lump was and testified that it could have been large enough to contain some of the firearms he had seen in the past.

The officer removed the lump from defendant's pocket and saw that it was a crumpled up cigarette package. The officer knew that a very common place to store baggies of methamphetamine is between the cellophane wrapper and the cigarette package itself. The officer turned the crumpled up package around in his hand and saw a small plastic baggie of a white, crystal powder between the cigarette package and the cellophane wrapper. Based on the officer's training and experience, he believed that the powder was methamphetamine.[1]

The officer then arrested defendant for PCS, put him in the back of his patrol car, searched the van, and found a variety of scales, packaging materials, and a cut-down material for methamphetamine called Vitablend. The officer also found a semi-automatic pistol with ground off serial numbers, a revolver in the sleeping berth just above the driver's

---

[1] The material in the baggie was later sent to the state crime lab, where it was identified as methamphetamine.

seat, and a .22 semi-automatic pistol in a cabinet drawer in the back of the van.

Before trial, defendant filed a motion to suppress all evidence and statements taken from him pursuant to the search of his person, arguing that the search and seizure violated his rights under the Fourth Amendment to the United States Constitution and Article I, section 9, of the Oregon Constitution. The trial court denied defendant's motion and found defendant guilty of PCS after a trial on stipulated facts. In ruling on defendant's motion to suppress, the trial court stated that

> "whether or not there was sufficient probable cause for the pat down of the defendant who was a passenger in this motor home or van, the Court finds that based on the officer's original probable cause that there were drugs in the van and that based on his own experience and training that he had a basis to pat down the defendant and the Court finds that the crumpled pack could contain a weapon based on the circumstances presented. You can hide all sorts of little things that are weapons. When he pulled out the package and saw the bindle of methamphetamine in plain view and had probable cause to believe it was methamphetamine, the Court finds that was sufficient and so the Court will deny the motion to suppress * * *."

On appeal, defendant argues that the trial court erred in denying his motion to suppress. Specifically, defendant challenges the patdown search and the removal of the "lump" from his rear pocket during that search.

■　　We first consider whether the officer's decision to pat defendant down is supported by reasonable suspicion. Defendant contends it was not. The state responds that the patdown was justified by officer safety concerns. We agree with the state.

■■　　The officer safety principle at work in this case is straightforward. An officer is permitted to take

> "reasonable steps to protect himself or others if, during the course of a lawful encounter with a citizen, the officer develops reasonable suspicion, based upon specific and articulable facts, that the citizen might pose an immediate threat of

> serious physical injury to the officer or to others then present."

*State v. Bates*, 304 Or 519, 524, 747 P2d 991 (1987). Reasonable suspicion has both a subjective and an objective component. Consequently, we must consider whether the officer subjectively believed that defendant posed a threat of harm and whether that belief was objectively reasonable under the circumstances as they appeared to the officer at the time. *Bates*, 304 Or at 525; *see also* ORS 131.605(5) ("Reasonably suspects" means "that a peace officer holds a belief that is reasonable under the totality of the circumstances existing at the time and place the peace officer acts.").

The facts, as known or reasonably suspected by the officer when he performed the patdown, are equally straightforward. The officer stopped the van—which had been converted to a motor home-type of vehicle—at approximately 9:00 p.m. It was dark. The officer had reliable information that the driver of the motor home, Mike Wiggins, was using and selling methamphetamine and was conducting his methamphetamine operation from the motor home. The information included the facts that, within 24 hours of the stop, the motor home had been observed to contain a substantial amount of methamphetamine (approximately 12 to 15 times the amount of a typical street sales transaction), along with packaging materials and electronic scales (located in the back of the vehicle) used for weighing the methamphetamine. The motor home, as Wiggins acknowledged to the officer at the time of the stop, served as Wiggins's primary residence. In effect, then, the vehicle was the equivalent of a personal residence (albeit a small and mobile one) that the officer reasonably suspected was the base for a methamphetamine operation.

Wiggins, on being stopped, immediately got out of the motor home and met the officer partway between it and the officer's patrol car. The officer was not immediately aware that anyone else was in the motor home at that time.[2] The officer talked to Wiggins for approximately five to 10

---

[2] The officer was not asked, and did not testify about, when he first became aware of defendant's presence in the van. We draw from defendant's testimony on that point.

minutes, during which time Wiggins denied that the motor home contained any drugs and declined to give the officer consent to search it. The officer then told Wiggins that, because he had probable cause and exigent circumstances to search the motor home for drugs, he was going to do so without Wiggins's consent. At that point, Wiggins told the officer that there were two other people inside the motor home. The officer went to the motor home, contacted those individuals, and had them get out of the vehicle, one at a time. Defendant, who the officer knew to be Wiggins's brother, was the second of the two to leave the motor home. Estimates of the total time that defendant remained in the motor home while the officer talked to Wiggins and later to the other passenger varied from 10 to 30 minutes. During that time, defendant was seated in the back of the van.

The officer knew from his general training and experience as a police officer that "people [who] use and sell methamphetamine tend to carry firearms for their protection and the protection of their product." Regarding Wiggins in particular, the officer had information that Wiggins had owned numerous firearms, with estimates ranging up to "a hundred or more." Regarding defendant (Wiggins's brother), the officer knew he was an outdoorsman and avid hunter. The officer testified that those facts, in combination with the information about the methamphetamine operation housed in the motor home, led him to patdown defendant for purposes of officer safety.

The patdown of defendant was eminently reasonable. The officer had reliable information that the motor home was being used to conduct methamphetamine sales. He therefore reasonably could have believed that there would be firearms in the motor home generally. That belief was all the more reasonable given Wiggins's history of firearms possession and the fact that the motor home, as his primary residence, was the likely place for him to keep whatever firearms he owned. The passengers were, in effect, the equivalent of visitors in a residence where drug activities and weapons are suspected.

We have upheld safety patdowns of visitors inside a home to be searched for drug activity, where guns were suspected to be in the home, on the theory that officers may

reasonably fear that the "putative weapons would be readily accessible to any occupant, including a visitor." *State v. Barnett*, 132 Or App 520, 524, 888 P2d 1064, *rev den*, 321 Or 137 (1995); *accord State v. Swibies*, 183 Or App 460, 466-69, 53 P3d 447 (2002) (affirming same principle). The only distinction between that situation and this one is that these "visitors" had stepped out of the van at the time of the frisk. But that is a distinction without a difference. If anything, the situation here provided a greater justification for officer safety concerns. These passengers had been confined in a particularly small space, evidently without any police awareness of them, for a significant length of time while the officer confronted Wiggins with the information about the methamphetamine operation. During that time, defendant, who was not only a passenger but was Wiggins's brother, was in the back of the motor home where the scales and other methamphetamine sales paraphernalia had been seen within the last 24 hours. The officer knew that defendant was Wiggins's brother and knew him to be a hunter. The officer therefore could reasonably infer that defendant was familiar with guns and was comfortable using them. When defendant got out of the motor home at the officer's insistence, it was dark. On those facts, the officer's patdown of defendant was a reasonable officer safety measure that did not offend Article I, section 9.[3]

■■ The legality of the officer's action in removing what he described as a "lump" in defendant's right rear pocket is a closer question. Seizure of an item on officer safety grounds is valid only if

> "there exists reasonable suspicion that the object might contain a weapon. Such reasonable suspicion exists where: (1) the container has the physical capacity to conceal a weapon; and (2) under the totality of the circumstances, there was a reasonable suspicion that it did contain a weapon."

*State v. Gilkey / White*, 172 Or App 95, 100, 18 P3d 402 (2001) (citations and internal quotation marks omitted); *see also State v. Miears*, 166 Or App 228, 234, 999 P2d 493, *rev den*,

---

[3] Although defendant cites the Fourth Amendment, he does not argue that the patdown violated his rights under the federal constitution.

331 Or 192 (2000) (officer must hold subjective belief that the object the officer feels is a weapon and must also state specific and articulable facts to show that belief is objectively reasonable).

∎ Here, the trial court found that "the crumpled pack could contain a weapon based on the circumstances presented." The trial court did not expressly find, however, that the officer had a subjective belief that the lump was a weapon. Of course, pursuant to our proper standard of review, we presume that the court implicitly made findings that are consistent with its legal disposition, if the record supports such findings. *See, e.g., State v. Long*, 320 Or 361, 370, 885 P2d 696 (1994), *cert den*, 514 US 1087 (1995). In this case, however, we agree with defendant that the facts do not support a finding that the officer held a subjective belief that the lump contained a weapon, whether or not, on this record, such a belief would have been objectively reasonable.

∎ The officer was asked: "What happened when you patted down [defendant]?" He answered:

> "When I was patting him down in the right rear pocket of his jeans that he was wearing, there was a crumpled cigarette pack. On numerous occasions when I've arrested people for possession of methamphetamine, I have found that a very common place to store the baggies, the little zip lock baggies of methamphetamine, is between the cellophane wrapper and the cigarette package itself. It blends in very well and if you're not looking for it you can miss it *and so I pulled out this crumpled cigarette pack* and I just looked at it and right between the cigarette package and the cellophane wrapper was a small plastic baggie of methamphetamine or at the time it was just a white crystal powder."

That testimony unequivocally establishes that the officer's reason for pulling the crumpled cigarette pack from defendant's pocket—that is, his subjective belief at the time—was his suspicion that the pack might contain drugs. He did not testify that he was concerned that the crumpled pack could conceal any of the types of firearms that Wiggins was known to possess and that might have been within defendant's easy reach before getting out of the motor home. To be sure, the prosecutor later, using a leading question, asked the officer: "Was that lump large enough to have contained a weapon?"

The officer answered: "Some of the firearms I've seen, yes, it could have." But that was a question and an answer as to what conceivably was physically possible, not what the officer actually suspected in this instance. Although the testifying officer is not required to utter any "magic words," *State v. Bickford*, 157 Or App 386, 390, 970 P2d 234 (1998), *rev den*, 329 Or 589 (2000), there must be evidence in the record that the officer subjectively believed that the lump in defendant's pocket contained a weapon. *Gilkey*, 172 Or App at 100. This record contains none. The evidence should have been suppressed for that reason.

Reversed and remanded.