Argued and submitted March 30, 2015, resubmitted en banc January 7, reversed and remanded April 6, petition for review denied September 15, 2016 (360 Or 401)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

PHILLIP DEWEY SMITH, JR.,
*Defendant-Appellant.*

Lincoln County Circuit Court
121337; A153778

373 P3d 1089

Emily P. Seltzer, Deputy Public Defender, argued the cause for appellant. With her on the briefs was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Jamie K. Contreras, Assistant Attorney General, argued the cause for respondent. On the brief were Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Tiffany Keast, Assistant Attorney General.

Before Hadlock, Chief Judge, and Armstrong, Ortega, Sercombe, Duncan, Egan, DeVore, Tookey, Garrett, Flynn, DeHoog, and Shorr, Judges.

SERCOMBE, J.

## SERCOMBE, J.

Defendant appeals a judgment of conviction for unlawful possession of methamphetamine, ORS 475.894. He assigns error to the trial court's denial of his motion to suppress evidence obtained as a result of a law enforcement officer's warrantless patdown of his clothing. Defendant contends that the court erred when it determined that the patdown search was justified by the officer safety exception to the warrant requirement under Article I, section 9, of the Oregon Constitution.[1] On review for errors of law, *State v. Ehly*, 317 Or 66, 74-75, 854 P2d 421 (1993), we conclude that the trial court erred in determining that the search was justified by the officer's reasonable suspicion, based on specific and articulable facts, that defendant might pose an immediate threat of serious physical injury to the officer. Accordingly, we reverse and remand.

In its memorandum opinion and order denying defendant's motion to suppress, the trial court set forth its factual findings:

"Officer Derrick [Scott] testified that on May 5, 2012, he was on routine patrol on U.S. Forest Service Road 1726 when he came upon a group of five males shooting guns at targets on live trees. This remote area had been known for people using trees for target practice and several trees had been shot down due to repeated gunshot fire. It was also known for people leaving garbage strewn about the area. Officer * * * [Scott] testified that he was going to issue citations for the federal violation of damaging trees.

"He had the individuals secure their weapons in their vehicles and then did an officer safety pat-down search of each of the individuals for weapons. When he patted down Defendant, he felt a pipe in his pocket. He asked the group if any of them had marijuana on them and they responded in the negative. He then asked Defendant what the pipe was for and Defendant responded, 'Meth.' He then placed * * * Defendant in handcuffs and retrieved the pipe, which was a glass pipe with residue that looked like

_____

[1] Article I, section 9, provides, in part, "No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure[.]"

methamphetamine. Defendant was arrested and charged with Unlawful Possession of Methamphetamine."

Defendant filed a pretrial motion to suppress the evidence obtained as a result of Scott's warrantless patdown of his clothing, asserting that the patdown violated Article I, section 9. In support of his motion to suppress, defendant contended that the officer's warrantless patdown was not justified by officer safety concerns, and, thus, all evidence derived from the unlawful search should be suppressed.

At the hearing on the motion to suppress, Scott acknowledged that, when he approached the group, defendant and his companions complied with his request to secure their weapons and were not difficult or threatening. More specifically, Scott testified that (1) he had no difficulty in getting the members of the target-shooting group who were armed to put their rifles in a secure location; (2) when he first encountered defendant, defendant was not committing a crime—Scott suspected that defendant had violated a Forest Service regulation that proscribed damaging trees; (3) there was nothing about defendant's "demeanor or how he handled himself" that was concerning—defendant was, in fact, "compliant" and "positive" and was not "combative in any way"; (4) defendant did not do anything "towards" him that gave Scott any concern for his safety; (5) other than some members of the group being armed when Scott approached the group, there was nothing that "anybody did at that scene, themselves, that caused [him] concern for [his] safety"; and (6) at the time of the patdown searches, Scott did not see any evidence that "anybody had any handguns or knives, anything like that."

Nevertheless, Scott testified that he conducted the patdown search for the following reasons: (1) he was alone; (2) he was in a remote area known for people illegally shooting at live trees and leaving trash; (3) his backup was one and a half to two hours away; (4) he initially approached a group of five unknown individuals with firearms in their possession; (5) the first thing he said to the group was that he is an officer with the Forest Service and that he was making contact with them about violations relating to their use of firearms to illegally damage forest property and leaving

trash behind; (6) he planned to issue them citations for those violations; and (7) he did not know if any individuals in the group had any concealed weapons after he had them secure their visible firearms a couple feet away from where he spoke to the group during the encounter. That said, Scott summed up his reason for conducting the patdown search: "[T]hey had guns, that's enough."[2]

In light of that evidence, the state argued that Scott's patdown search of defendant was "completely reasonable under the circumstances" due to officer safety concerns. The court agreed and denied defendant's motion to suppress.

As noted, on appeal, defendant contends that the trial court erred in denying his motion to suppress evidence obtained as a result of the warrantless patdown. In his view, the officer safety exception to the warrant requirement does not apply because, to the extent Scott believed that defendant posed an immediate threat, that belief was not reasonable. According to defendant, there must be specific, articulable facts to justify an officer's conclusion that a person presents an immediate threat of harm. He asserts that, in this case, once he and his friends had secured their firearms and he was otherwise cooperative, Scott could not have reasonably believed that defendant posed an immediate threat. In defendant's view, Scott's decision to conduct a patdown at that point was unnecessarily intrusive and disproportionate to any perceived threat. The state, for its part, contends that the officer reasonably feared for his safety under the circumstances and, therefore, the search was justified under the officer safety exception.

"Normally, in order for a search to be constitutionally permissible, the police must have a search warrant." *State v. Paulson*, 313 Or 346, 351, 833 P2d 1278 (1992). The Supreme Court has stated that "[e]vidence is not suppressed unless the search was 'unreasonable' under Article I, section 9, of the Oregon Constitution." *Id.* "A warrantless search by the police is 'reasonable' under Article I, section 9, when the search falls into one or another of the recognized exceptions to the warrant requirement." *Id.* One such exception is the

---

[2] At the suppression hearing, the prosecutor stated that "rifles" were "secure[d] *** in the vehicle." Scott's search was for concealed weapons.

"officer safety" doctrine articulated by the Supreme Court in *State v. Bates*, 304 Or 519, 524, 747 P2d 991 (1987):

> "Article I, section 9, of the Oregon Constitution, does not forbid an officer to take reasonable steps to protect himself or others if, during the course of a lawful encounter with a citizen, the officer develops a reasonable suspicion, based upon specific and articulable facts, that the citizen might pose an immediate threat of serious physical injury to the officer or to others then present."

Under the officer safety exception to the warrant requirement, the state must establish that "the officer subjectively believed that the defendant posed a threat" and "that the officer's belief was objectively reasonable." *State v. Rodriguez-Perez*, 262 Or App 206, 213, 325 P3d 39 (2014). "To be objectively reasonable, 'the officer's safety concerns must be based on facts specific to the particular person searched, not on intuition or a generalized fear that the person may pose a threat to the officer's safety.'" *Id.* (quoting *State v. Jackson*, 190 Or App 194, 198, 78 P3d 584 (2003), *rev den*, 337 Or 182 (2004)); *see also State v. Miglavs*, 337 Or 1, 12, 90 P3d 607 (2004) (pertinent facts to justify an officer safety search must be "sufficiently particularized to defendant as required under Article I, section 9"). "In determining whether an officer's concern for safety was objectively reasonable, we consider 'the totality of the circumstances as they reasonably appeared to the officer at the time.'" *Rodriguez-Perez*, 262 Or App at 213 (quoting *Jackson*, 190 Or App at 199 (brackets and ellipses omitted)).

Thus, the issue on appeal is whether Scott's safety concern was objectively reasonable at the time of the search. That is, the issue is whether the concern was "based on facts specific to [defendant], not on intuition or a generalized fear that [defendant might] pose a threat to [Scott's] safety." *Rodriguez-Perez*, 262 Or App at 213 (internal quotation marks omitted). Accordingly, we must determine whether there was sufficient evidence about defendant's demeanor, conduct, or status that suggested that defendant posed an immediate threat of serious injury to Scott. We conclude that there was not.

*Bates* supplies the core of the applicable analysis. There, police officers stopped an automobile driven by the

defendant in the early morning hours in a high-crime area. 304 Or at 521. A television and videocassette recorder in the automobile were in plain view of the officers. *Id.* The defendant failed to pull a bag that was partially under the front seat of the automobile into view as directed. *Id.* The officers then searched the bag and the rest of the interior of the vehicle. *Id.* at 521-22.

On review, the Supreme Court suppressed the evidence seized in those searches. *Id.* As noted, the court held that, under appropriate circumstances, officer safety concerns could justify a warrantless patdown under the Oregon Constitution when, "during the course of a lawful encounter with a citizen, the officer develops a reasonable suspicion, based upon specific and articulable facts, that the citizen might pose an immediate threat of serious physical injury to the officer or to others then present." *Id.* at 524.

In *Bates*, the police officer testified that he was concerned for his safety because the vehicle had out-of-state plates and because of the time of day, the high-crime area of the stop, "'the way [the defendant] look[ed],'" the presence of the videocassette recorder and television in the back seat of the automobile, and the defendant's failure to comply with his instruction to move the bag. *Id.* at 525. Given the absence of "anything in [the] defendant's manner [to] suggest that he was dangerous" or something in the context of the stop (the high-crime area and the late hour) that "[told the court] whether *this* defendant [was] likely to be a criminal," and the fact that the equipment in the back seat did not justify "a suspicion * * * that this defendant posed an immediate threat," the court held that the search was not justified by the officer safety exception to the warrant requirement. *Id.* at 525-27 (emphasis in original). In reaching that conclusion, the court noted that the bag under the seat lacked "any indication that [it] either was a weapon or contained one," *id.* at 526, and stated:

> "The facts * * * in this case fall short of creating a reasonable belief that this defendant posed an immediate threat. In light of defendant's cooperative attitude, his lack of aggressive or threatening behavior and the absence of any apparent weapon, the mere possibility that he might have

committed a crime and the presence of what appeared to be a bag are not sufficient."

*Id.* at 527.

As in *Bates*, here, in light of defendant's cooperative attitude, his lack of aggressive or threatening behavior, and the absence of any apparent weapon, the mere possibility that defendant might have committed a violation and the fact that defendant's clothing might have been a suitable receptacle to hold a weapon were not sufficient to create a reasonable belief that defendant posed an immediate threat.

Scott had a generalized safety concern based on the size of the group, the remoteness of the location, and the absence of a backup officer.[3] But where a defendant cooperates with police, in the absence of any threatening behavior by the defendant, generalized safety concerns (in other words, facts that are not particular to the defendant) are insufficient to justify an officer safety search. *See Rodriguez-Perez*, 262 Or App at 215-16 (officer safety search was not permissible where "[n]either defendant's demeanor nor his physical actions * * * would support a reasonable suspicion that defendant posed an immediate threat of serious physical injury," and the defendant made no "aggressive, hostile, or threatening movements," the defendant made no "threatening remarks," the officer had no prior knowledge whether the defendant had a violent history or reputation, and the defendant made no "furtive movements such as reaching into his pockets or clothing as if to retrieve a weapon"); *State v. Steffens*, 250 Or App 742, 749, 752-54, 282 P3d 888 (2012) (extending a traffic stop was not justified on officer safety grounds where the "defendant had recently been arrested for possession of a concealed weapon," the "defendant appeared to have lied about the number of times he had been arrested," and gang-related crime was common in the neighborhood, but the defendant did not appear to

---

[3] We recognized recently in *State v. Thomas*, 276 Or App 334, 339, 367 P3d 537 (2016), that "the presence of multiple people can heighten an officer's safety concern so as to permit a patdown of one person" where a companion of the person has been found to be armed. (Citing *Miglavs*, 337 Or at 13.) Because no companions of defendant were apparently armed after the weapons were secured and before defendant was searched, the size of the group provides no defendant-specific evidence of reasonable suspicion of an immediate threat.

be in a gang, was "relaxed, unconcerned, and cooperative," made no furtive movements, and "had no known history of violence against police officers"); *State v. Amell*, 230 Or App 336, 341, 345, 215 P3d 910 (2009) (patdown not justified on officer safety grounds where, despite the officer's observation of a "digging movement" by the defendant—which the officer believed to be consistent with retrieving a weapon—and the defendant's lie about whether his license was suspended, the "defendant was cooperative at all times, did not show hostility, and made no suspicious movements during his interaction with the police"); *State v. Dyer*, 157 Or App 326, 332-33, 970 P2d 249 (1998) (search of the defendant's car was not justified on officer safety grounds because, "[w]hile [the officer] had some generalized safety concerns because of [defendant's] mode of transportation, the location of the stop and his suspicion that defendant's car might contain a weapon, his description of defendant's behavior during the encounter [which was cooperative and cheerful] indicates that he had no specific safety concerns based on defendant's behavior"); *State v. Haney*, 153 Or App 642, 647, 958 P2d 192 (1998) (search of the defendant's bag was not justified on officer safety grounds, pointing out that "[t]here was * * * no evidence that defendant, who had been cooperative, made the officers fear for their safety"); *State v. Moreno*, 150 Or App 306, 308-10, 946 P2d 317 (1997) (patdown of the defendant was not justified where the defendant, who spoke limited English, stared at the officers and was unusually slow to remove his hands from his pockets when asked by a police officer, because there were "no articulable facts that demonstrate[d] objectively, such as gestures or threats, that the officers were in danger").

The state and the dissent suggest that the fact that defendant and his companions were armed with rifles when first encountered by Scott is sufficient evidence to foster a reasonable suspicion that defendant was carrying a concealed weapon and, thus, posed an immediate threat to Scott. We disagree. That inference—that persons who engage in target shooting with rifles are likely to carry other concealed weapons—is nothing more than speculation. The inference is not a matter of common knowledge. It was not established by proof at the hearing. Scott did not testify that,

in his experience and training, target shooters are usually well-armed. Because that inference is speculative, it is not a "specific and articulable fact" that suffices under *Bates* to establish "an immediate threat of serious injury."[4]

Our case law reinforces that conclusion. It suggests that the presence of a weapon on a suspect is insufficient evidence *by itself* of a reasonable suspicion that the suspect might possess an additional weapon. *See State v. Easton*, 264 Or App 339, 344, 332 P3d 315 (2014) ("[A]lthough it might be prudent for an officer to [assume that the presence of one weapon indicates that more weapons are present], 'where no articulable facts support the assumption, it is not a sufficient basis for a warrantless search.'" (Quoting *State v. Bentz*, 211 Or App 129, 137, 158 P3d 1081 (2007).)).

Thus, we disagree with the dissent in its conclusion that "the circumstance that defendant and his companions were target shooting illegally with multiple firearms * * * reasonably suggests that there were additional weapons * * *." 277 Or App at 314 (Tookey, J. dissenting). Simply put, no articulable facts support that assumption.

By comparison, *State v. Redmond*, 114 Or App 197, 834 P2d 516 (1991), and *State v. Pope*, 150 Or App 457, 946 P2d 1157 (1997), *rev den*, 327 Or 521 (1998), are examples of cases where additional articulable facts beyond possession of a single weapon supported the conclusion that additional weapons might be present. In both of those cases, we concluded that reasonable suspicion of an immediate threat of serious harm was demonstrated by officer testimony about the violent nature of an outlaw biker gang and the specifics of the defendants' behavior that led the officer to reasonably believe that the defendants were members of that gang.

In *Redmond*, the officer testified that the members of the Brother's Speed motorcycle club were known to

---

[4] Indeed, the evidence about defendant known to Scott *at the time of the search* points to the opposite conclusion. Defendant had complied with Scott's direction to disarm himself and had secured his rifle in the truck. Evidence that defendant was disarmed more likely supports the conclusion that defendant was no longer armed.

carry weapons that they used to harm police or the public and that the defendant was wearing colors associated with that club. 114 Or App at 199-201. He also observed that the defendant was wearing a patch identifying him as the club's "'Sergeant-at-Arms,'" which indicated to the officer that he was an "'enforcer'" for the club and likely to be armed. *Id.* at 201. We observed that the officer's "perceptions of the stereotypical practices of motorcycle club members is the kind of generalized suspicion that seldom will constitute a reasonable suspicion based on particularized facts." *Id.* However, we explained that the officer's "generalized understanding of the practices of motorcycle club members became a specific and particularized reality when he saw that [the] defendant was armed with a knife." *Id.* Thus, under *Redmond*, where the totality of the circumstances permit the inference that a suspect is a member of a specific violent group and is, therefore, likely to be carrying multiple weapons, the suspect's possession of one weapon can support a reasonable suspicion that the suspect may possess an additional weapon.

Similarly, in *Pope*, the officer testified that he believed the defendant to be a member of the Vagos motorcycle club, which he knew to be violent. 150 Or App at 459. Although the defendant was not wearing the club's colors, he was riding with a person who was. *Id.* In addition, the officer knew, based on his training, that uninitiated members, or "'probates,'" did not wear the club's colors. *Id.* at 460. The officer also knew from his training that probates often had to commit acts of violence to complete their initiation and that probates sometimes carried weapons for full-fledged members of the club. *Id.* When the officer approached the defendant, the defendant admitted that he was wearing a knife on his belt. *Id.* In view of all those circumstances, we concluded that the knife on the defendant's belt reasonably increased the officer's suspicion that the defendant might be carrying more weapons, justifying an officer safety patdown. *Id.* at 462-63. That conclusion was not based merely on the presence of the knife. Instead, we emphasized that the knife confirmed the officer's suspicions that the defendant was a member of a violent and heavily armed group and, therefore, likely to continue to pose a threat to his safety, even after

the knife was removed from the defendant's possession. *Id.*[5] Here, in contrast, there was no evidence that the target shooters were violent and heavily armed, and there was no other context to suggest that the presence of one weapon foretold another.

This is also not a case where there was evidence that defendant was armed or had access to weapons that were not secured at the time of the search. In *State v. Wiggins*, 184 Or App 333, 338, 56 P3d 436 (2002), we concluded that a patdown of the defendant was justified on officer safety grounds where the defendant was a passenger in his brother's motor home and the officer did not know that the defendant was present at the time the motor home was stopped. In that case, the officer had reason to believe that there were weapons in the motor home because he believed that the defendant's brother, the driver, was both living in the motor home and producing and selling methamphetamine there. *Id.* at 339. The officer also knew that the defendant's brother had a history of carrying weapons, and, because the motor home was his residence, the officer believed that any weapons he owned would be inside of it. *Id.* When the police discovered the defendant, whom they knew to be an avid hunter and proficient with firearms, hidden in the motor home, they frisked him because they believed he would have had access to any weapons that were likely inside the motor home but were, as yet, unsecured. *Id.* at 339-40; *see also City of Portland v. Weigel*, 276 Or App 342, 345-46, 367 P3d 541 (2016) (handcuffing the defendant was based on a reasonable belief of immediate threat where the defendant was armed with an easily accessible deadly weapon and another potentially deadly weapon was nearby); *State v. Aman*, 164 Or App 348, 350, 354-55, 991 P2d 1096 (1999) (patdown justified on officer safety grounds, despite the defendant's cooperative attitude, where the defendant's companion, whom

---

[5] *Redmond* and *Pope* also involved uncooperative and potentially aggressive behavior. In *Redmond*, when the officer activated the lights on his patrol car, a car that was "associated" with the motorcycles positioned itself in between the officer's patrol car and the motorcycles in an apparent attempt to interfere with the stop. 114 Or App at 199, 201. In *Pope*, after the officer initiated a traffic stop of two motorcycles, they separated, pulling over roughly 200 feet apart. 150 Or App at 459. Both riders then dismounted and stood facing the officer's patrol car before the officer got out of that vehicle. *Id.*

the police were arresting on felony drug charges, told the officer that the drugs he had found in her purse belonged to the defendant and that the defendant had a gun on his person);[6] *State v. Rickard*, 150 Or App 517, 519, 527, 947 P2d 215, *rev den*, 326 Or 234 (1997) (officer safety concerns justified seizing occupants of a vehicle and ordering them to empty their pockets where bystanders had approached the officer yelling "'[h]e's got a gun'" while pointing at the vehicle). Here, there was no evidence that defendant had access to a weapon or was armed at the time of the search.

In sum, there was no evidence presented in this case of the type that we have found to provide reasonable suspicion of an immediate threat at that point of the search. Contrary to the dissent's speculation, there was no evidence that defendant was armed or had access to a weapon at the time of the search or that defendant acted consistently with being armed. In fact, the evidence suggested that defendant was disarmed. Defendant did not behave aggressively toward Scott. On the contrary, defendant's demeanor was polite and cooperative. There were no articulated facts that defendant might react violently to a citation for a noncriminal violation. Given the totality of the circumstances that pertained to defendant, there were no "specific and articulable facts, that [defendant] might pose an immediate threat of serious physical injury to the officer or to others then present." *Bates*, 304 Or at 524. Thus, the trial court erred in denying defendant's motion to suppress.

Reversed and remanded.

---

[6] In *Aman*, we stated that the "real possibility that defendant * * * was implicated [in a felony] greatly increased the potential that defendant would resort to force to interfere in the passenger's arrest or to avoid his own arrest." 164 Or App at 354. In contrast, in *State v. Miglavs*, 186 Or App 420, 428 & n 4, 63 P3d 1202 (2003), *aff'd*, 337 Or 1, 90 P3d 607 (2004), we cited *Aman* for the proposition that, unless an officer could articulate specific facts leading him or her to believe that a suspect would respond with aggression, a citation for a minor offense would *not* reasonably lead an officer to suspect that an individual would lash out violently to avoid arrest or citation. For example, if an officer knows that a citation will have serious consequences for a person, such as revocation of probation, then the fact that the officer intends to cite the person for a minor offense might reasonably cause the officer concern for his or her safety. *Id.* In this case, there was no evidence that Scott knew defendant or was aware of any facts that would lead him to suspect that defendant might react violently to a citation for a noncriminal violation.

**TOOKEY, J.,** dissenting.

The majority holds that the officer safety exception articulated by the Supreme Court in *State v. Bates*, 304 Or 519, 747 P2d 991 (1987), does not apply in this case, in which a lone police officer, in a remote forested area, confronted a group of five individuals with firearms to cite them for violations involving the use of their firearms. I do not agree that the trial court erred in determining that the officer safety exception applied to the encounter, because "it is not our function to uncharitably second-guess an officer's judgment" when "the precautions taken were reasonable under the circumstances as they reasonably appeared at the time the decision was made." *Id.* at 524-25. Because I believe that the majority has not faithfully applied the principles set forth in *Bates*, I respectfully dissent.

The majority articulates the issue on appeal as "whether there was sufficient evidence about defendant's demeanor, conduct, or status that suggested that defendant posed an immediate threat of serious injury to Scott." 277 Or App at 303. However, the correct inquiry is this: "Did any of the circumstances confronted by [Scott] either individually or collectively justify a reasonable suspicion that * * * defendant posed an immediate threat to [Scott]?" 304 Or at 525. That inquiry is critical because a particular fact about an individual "may be a circumstance that, when considered in the overall context or totality of the circumstances of a police-citizen contact, contributes to the reasonableness of an officer's safety assessment." *State v. Miglavs*, 337 Or 1, 13, 90 P3d 607 (2004). The majority's holding represents a failure to address the totality of the circumstances in this case.

The majority sums up its reasoning, stating that "there was no evidence presented in this case of the type that we have found to provide reasonable suspicion of an immediate threat." 277 Or App at 310. We have recognized that "fact matching can be a fool's errand" in officer safety cases because the material facts often vary significantly from case to case. *State v. Senn*, 145 Or App 538, 545, 930 P2d 874 (1996). I am not aware of any case we have considered in which an officer was approaching five armed

individuals alone, in a remote forested area, to cite them for violations involving the use of firearms, and the majority cites no case that involves those circumstances. Our case law guides our analysis, but it also requires us to consider the specific circumstances of this case. If we do not focus on the specific circumstances faced by Scott, then we lose our way in this inquiry.

First, unlike in *Bates*, defendant in this case was in possession of a firearm. The Supreme Court concluded that the officer in *Bates* did not have a reasonable belief that the defendant posed an immediate threat "[i]n light of [the] defendant's cooperative attitude, his lack of aggressive or threatening behavior and *the absence of any apparent weapon*[.]" *Bates*, 304 Or at 527 (emphasis added). The majority concludes:

> "As in *Bates*, here, in light of defendant's cooperative attitude, his lack of aggressive or threatening behavior, and *the absence of any apparent weapon,* the mere possibility that defendant *might* have committed a violation and the fact that defendant's clothing might have been a suitable receptacle to hold a weapon were not sufficient to create a reasonable belief that defendant posed an immediate threat."

277 Or App at 305 (emphasis added).

The majority's conclusions, regarding the presence of weapons, rest on a misapplication of our standard of review. Under *State v. Ehly*, 317 Or 66, 74-75, 854 P2d 421 (1993), we are bound by the trial court's findings of fact as long as there is constitutionally sufficient evidence in the record to support them. In the absence of express factual findings, we presume that the trial court decided the disputed facts in keeping with its ultimate conclusion. *Id.* at 75. On appeal, "[o]ur function is to decide whether the trial court applied legal principles correctly to those facts." *Id.*

Here, the trial court found that Scott "came upon a group of five males shooting guns at targets on live trees." Defendant testified that he complied with Scott's request to secure *his* weapon and that he had been shooting at the targets. That evidence supports the finding that defendant was in possession of a firearm and using the firearm in violation

of the law at the time Scott encountered the group. Thus, contrary to the majority's conclusion, there were facts sufficiently particularized to defendant that were articulated by Scott. 277 Or App at 303. I would conclude that defendant's possession of a firearm is a circumstance specific to defendant. In other words, defendant's possession of a firearm is a specific fact that is not based "on intuition or a generalized fear that [defendant] may pose a threat to [Scott's] safety." *State v. Jackson*, 190 Or App 194, 198, 78 P3d 584 (2003), *rev den*, 337 Or 182 (2004).

Second, Scott confronted a group with *multiple* weapons—not just one individual with a single weapon. The majority concludes, based on the state's closing argument, that the "inference—that persons who engage in target shooting with *rifles* are likely to carry other concealed weapons—is nothing more than speculation," and thus, "is not a 'specific and articulable fact' that suffices under *Bates*." 277 Or App at 306-07 (emphasis added). However, the trial court never expressly found that the group was using rifles, and there is no evidence in the record to support that suggestion. *See State v. Dugan*, 177 Or App 545, 550, 34 P3d 726 (2001) ("An attorney's arguments are not evidence."). The majority asserts that "[b]ecause no companions of defendant were apparently armed after their weapons were secured and before defendant was searched, the size of the group provides no defendant-specific evidence of reasonable suspicion of an immediate threat." 277 Or App at 305 n 3. At the time Scott searched defendant, he suspected that defendant or other members of the group may have had additional weapons other than those that he had seen them secure. *See Bates*, 304 Or at 525 (officer safety inquiry requires us to analyze "the circumstances as they reasonably appeared at the time that the decision was made"). The purpose of the patdown was to reveal whether defendant or his companions had any additional weapons that could be used to harm Scott while he issued citations to defendant and his companions.

It was not "too great an inferential leap," *State v. Bivins*, 191 Or App 460, 468, 83 P3d 379 (2004), for Scott to reasonably suspect that, when multiple weapons were being used in a remote area, there may have been additional

handguns or knives that he may not have observed. *See generally State v. Pope*, 150 Or App 457, 462-63, 946 P2d 1157 (1997), *rev den*, 327 Or 521 (1998) ("[A]n officer's discovery of a single weapon in a party's possession may reasonably increase, rather than lessen, the officer's suspicion that the party is holding additional weapons."); *Bivins*, 191 Or App at 467 ("The line between a reasonable inference * * * and an impermissible speculation * * * is drawn by the laws of logic."); *State v. Daniels*, 234 Or App 533, 542, 228 P3d 695, *rev den*, 349 Or 171 (2010) (knowledge that is based on common sense does not need any reference to training and experience). The majority's assertion that it is speculative for Scott to infer that people are likely to carry any concealed weapons—including pocket knives—when they are engaged in recreational activities in rural areas, demonstrates that the majority views the circumstances faced by Scott through an urban lens. *See Jackson*, 190 Or App at 199 (the appropriate inquiry examines the circumstances *as they reasonably appeared to the officer*). I conclude that the circumstance that defendant and his companions were target shooting illegally with multiple firearms when they were confronted by Scott is a "specific and articulable fact" that reasonably suggests that there were additional weapons that Scott did not observe when he initially encountered the group.

Finally, the specific facts that defendant was target shooting illegally and in a group in possession of multiple weapons must be viewed in light of the totality of the circumstances set forth below. It is true, as the majority points out, that defendant and his companions complied with Scott's request to secure their weapons and were not difficult or threatening. But the fact that Scott mitigated "that most immediate and obvious threat, before undertaking a complete frisk, does not diminish the reasonableness of [Scott's] belief that defendant might be armed with additional weapons and was presently dangerous." *State v. Redmond*, 114 Or App 197, 201, 834 P2d 516 (1992). Defendant's "cooperative attitude and lack of suspicious behavior" are two circumstances we must consider, but, ultimately, we must consider "whether the totality of the circumstances justified the decision to engage in a precautionary patdown." *Miglavs*, 337 Or at 11-12.

In sum, as established on this record, there were three salient circumstances known to Scott at the time of the encounter. First, Scott was alone in a remote forested area and his backup was one-and-a-half to two hours away. Safety concerns increase when an officer is alone, without backup, or in an isolated area. *See State v. Roe,* 154 Or App 71, 75, 961 P2d 228 (1998) (officer by himself in an isolated area); *State v. Austin,* 145 Or App 217, 224, 929 P2d 1022 (1996), *rev den,* 325 Or 368 (1997) (officer alone without backup).

Second, Scott approached a group of five unknown individuals with firearms in their possession. Safety concerns can increase when an officer confronts multiple suspects, *see Miglavs,* 337 Or at 14 (officer safety concern increased due to the officers' need to focus their attention on the defendant's companion rather than the defendant who had remained in close proximity to the officers), and when weapons are present. *See Pope,* 150 Or App at 462-63 (knife in sheath on belt); *Redmond,* 114 Or App at 201 (sheathed knife); *State v. Riley,* 240 Or 521, 523, 402 P2d 741 (1965) (gun under the driver's seat with the butt of the gun sticking out). As previously noted, defendant and his companions were polite and cooperative, but, understandably, the presence of multiple weapons and multiple suspects, when combined, substantially enhanced the objective reasonableness of Scott's safety concern. *See State v. Thomas,* 276 Or App 334, 339, 367 P3d 537 (2016) (stating that "the presence of multiple people can heighten an officer's safety concern so as to permit a patdown of one person" when there are weapons present).

Third, the individuals in the group were wearing clothing that could conceal a weapon, and Scott did not know if any of them had any handguns or knives after they placed their visible firearms in their vehicle a couple feet away. *See Miglavs,* 337 Or at 13 (baggy clothing alone would not support a reasonable suspicion that the defendant posed a risk to officer safety, but because the group that the defendant was associated with was known to possess weapons, a concern that the clothing could conceal a weapon was reasonable); *City of Portland v. Weigel,* 276 Or App 342, 344-45,

367 P3d 541 (2016) (officer safety concern increased when the armed defendant had immediate access to a weapon and another weapon "about ten feet away").

Those circumstances, collectively, gave rise to an objectively reasonable belief that defendant posed an immediate threat of serious physical injury to Scott. The fundamental question facing an officer in Scott's situation is how to proceed. This court's "empathy is necessarily imperfect"—we do not know what it is like to be a lone police officer confronting five armed individuals to cite them for their unlawful use of firearms in a remote forested area. *See State v. Miglavs*, 186 Or App 420, 434, 63 P3d 1202 (2003) (Haselton, J., concurring). Questions we should ask ourselves include, "Would I have been apprehensive—even scared?" and would my response under these circumstances have been similar to Scott's? *Id.* In light of the *Bates* inquiry, to determine whether "any of the circumstances confronted by [Scott] either individually or collectively justify a reasonable suspicion that * * * defendant posed an immediate threat to [Scott]," my answer to those questions is yes. 304 Or at 525. Scott's apprehension that defendant or his companions might have had additional weapons was objectively reasonable.

Therefore, I conclude that Scott responded reasonably by conducting a patdown of defendant. *See State v. Rudder*, 347 Or 14, 25, 217 P3d 1064 (2009) ("The constitution requires us to adhere to the principle that an officer's reasonable suspicion that a suspect might have a weapon on the suspect's person can justify a patdown[.]"). *Bates* instructs us to not "uncharitably second-guess an officer's judgment" because it is too easy with the benefit of hindsight to unfairly minimize the "life-or-death decisions" that officers frequently make "in a matter of seconds." 304 Or at 524; *Austin*, 145 Or App at 224-25 (refusing to second-guess officer's decision to draw his weapon and order the defendant to the ground to frisk him when officer was alone, without backup, and believed the defendant had a gun). In my view, the trial court did not err when it concluded that Scott "took reasonable precaution to protect himself from the group by requiring them to put away their observable firearms and then conduct a patdown search to determine

if they possessed any weapons that could hurt him while he was issuing citations for the violations." Thus, I respectfully dissent.

Hadlock, C. J., DeVore, J., and Shorr, J., join in this dissent.